LYKINS, Admr. of the Estate of Lykins, Deceased, et al., Appellants,

v.

MIAMI VALLEY HOSPITAL et al., Appellees.

[Cite as *Lykins v. Miami Valley Hosp.,* 157 Ohio App.3d 291, 2004-Ohio-2732.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19784.

Decided May 28, 2004.

292

296

298

Dwight D. Brannon, for appellants.

Neil F. Freund, for appellees.

FAIN, Presiding Judge.

{¶ 1} Plaintiffs-appellants, Tina M. Lykins and her minor children, appeal from a judgment rendered against them on their claims for medical malpractice, following a jury verdict adverse to them on their claims. For ease of reference, the plaintiffs-appellants will be referred to collectively as "Lykins" throughout this opinion. Lykins alleges that the trial court committed numerous errors during the trial of this case. She also claims that the defense acted improperly in numerous respects.

{¶ 2} From our review of the record, we conclude that any errors committed by the trial court were harmless. We further conclude that the record does not support the claim of improper conduct on the part of the defendants, defense counsel, or the defense witnesses.

{¶ 3} Accordingly, the judgment of the trial court is affirmed.

I

{¶ 4} On March 1, 2000, David Lykins began experiencing pain in his shoulder. The next morning, David's wife Tina called the office of their family doctor, Todd Kepler, regarding David's complaints. Upon being informed that Dr. Kepler could not see David until 11:00, Tina and David asked for, and received, a referral to an urgent care center.

{¶ 5} That same day, David was examined by Dr. Hossain at the urgent care center. He complained of shoulder pain, nausea, tiredness, headache, and stated that he felt "dry." He also related that he "had fever." David also told the urgent care staff that he worked for the fire department, that he had lifted patients, and that the pain began hours later. David vomited while at the urgent care center. David's temperature was normal when taken at the urgent care center. David had no redness, heat, or wound to the skin.

{¶ 6} Dr. Hossain gave David an injection of Phenergan to alleviate the nausea, and sent him to the emergency room at Miami Valley Hospital ("MVH") for blood work. Dr. Hossain gave Lykins a referral form that stated: "severe left shoulder pain, need septic arthritis ruled out." Dr. Hossain also called the MVH emergency department and left a message regarding his findings and the reason for referring David to the hospital.

{¶ 7} At MVH, David was first seen by a triage nurse, Jan Licht. She took the Lykinses to a triage room, where she saw the urgent care form, and she noted David's information and history and checked his vital signs. David's vital signs, including his temperature, were normal. David complained of pain, chills, and fever, and he appeared pale. Licht categorized David as non-urgent.

{¶ 8} Physician's Assistant Edward Chance saw David and obtained a history. David indicated that he had been lifting patients and thought that he may have hurt his shoulder. David also indicated that he was not taking any medications. Chance conducted an examination of David, including his shoulder, chest, and back. David's skin showed no signs of trauma, scratches, or infection. David had no chest pain. Chance ordered an x-ray of the shoulder and clavicle, which was normal. David's vital signs were stable. Chance was aware that Dr. Hossain had requested that septic arthritis be ruled out. Chance found no signs or symptoms of infection.

{¶ 9} Dr. Timothy MacLean also examined David and performed a physical examination, which included palpating the shoulder and chest and having David perform range-of-motion exercises. David indicated that he had hurt his left shoulder. MacLean noticed no swelling, discoloration, redness, heat, or skin breaks in the chest area. David had no pain in his chest area. David's vital signs were normal except that his heart rate was slightly elevated—a finding common with pain. MacLean associated the vomiting with the pain David was experiencing in his shoulder. MacLean's dictated notes indicated that nothing in David's examination or history indicated a septic joint.

{¶ 10} David was given Demerol and Phenergan. Phenergan is used to control nausea and vomiting but also helps make Demerol work better and helps alleviate any nausea caused by the Demerol. David did vomit—a common side-effect of Demerol—while at the hospital.

{¶ 11} David was discharged, in stable condition, from MVH with a diagnosis of left shoulder strain/sprain. His arm was placed in a sling, and he was given a prescription for pain medication. David was told to return if the condition worsened and to follow up with Dr. Kepler.

{¶ 12} Chance telephoned Dr. Kepler regarding the diagnosis and to inform Kepler that David needed to be seen within a few days. Chance made a notation in the chart that Kepler indicated that David "tends to sometimes overreact to his health care needs."

{¶ 13} Neither the urgent care form nor the telephone form noting Dr. Hossain's call to the hospital was retained in the hospital record.

{¶ 14} During the course of the night, David's condition worsened. Tina telephoned Dr. Kepler's office and spoke to Kepler's partner, who told the Lykinses that they could return to the emergency room or they could see Dr. Kepler in the morning. The Lykinses elected to wait to see Kepler. Upon arrival at Kepler's office at 8:00 a.m., it was noted that David appeared septic. Kepler immediately told the Lykinses to return to MVH.

{¶ 15} When he returned to MVH, it was immediately noted that David had skin discoloration on his left chest. MacLean started David on fluids and ran some tests. Other physicians were consulted, and David was admitted to the hospital with "acute soft tissue infection in the left side of the chest with septic shock and multiple organ failure with acute renal failure and acute hepatic failure." He was immediately placed on antibiotics.

{¶ 16} David had contracted Necrotizing Fasciitis and Necrotizing Myositis, which are popularly referred to as "flesh-eating bacteria." They are caused by bacteria known as Group A Streptococcus. The disease does not actually eat the flesh. Instead, it causes the blood supply to muscles to be cut off, resulting in the death of the muscle.[1] The disease may enter the system in two ways. First, and more commonly, a person has a "portal of entry"—for example, a cut, surgical incision or other wound to the skin—which permits the bacteria to enter the body. Second, and more rarely, is the type in which there is no portal of entry, and the person comes into contact with the bacteria, which then passes through the blood stream and settles in an area of trauma.

{¶ 17} Gary Anderson is a board-certified general surgeon. He was called into the MVH emergency room on March 3 to examine David. He was able to make a diagnosis just from observing David's chest. When he initially saw David, he observed a discolored, darkened spot about the size of "a fifty-cent piece" above David's left nipple. In the short amount of time between Anderson's initially seeing David and obtaining a CAT scan, the lesion had grown to the size of a softball, so that Anderson was "impressed" with how "rapidly progressing" the infection was.

{¶ 18} Anderson immediately took David into surgery to remove the affected tissue. Some skin, fascia, and muscle were removed from the chest wall. Following that surgery, according to Anderson, "there was nothing at that point that would say [David] would not survive." Anderson was "a little encouraged" at that point because the infection was not more extensive.

{¶ 19} David underwent a second, "re-look" operation approximately 12 hours later. This followup procedure is common with this type of infection. The infection had not extended beyond the margins of the first operation, no more necrotic tissue was discovered, and it appeared that the surgery had controlled the infection.

{¶ 20} David was placed on medications to keep his blood pressure from dropping too low. However, these medications caused a lack of blood flow to other portions of David's system. Therefore, David had two more operations to

---

1. Necrotizing Fasciitis involves the fascia covering the muscle, while Necrotizing Myositis involves muscle.

remove areas of his body that were suffering from necrosis due to a lack of blood flow caused by the medications. This included removal of David's gall bladder and a portion of his right colon.

{¶ 21} Subsequently, David underwent another procedure to determine whether his small intestine was functioning. At that point, it was discovered that his entire small intestine had shut down. David subsequently died as a result of the multi-system organ failure that was caused by the initial infection.

{¶ 22} Dr. Anderson indicated that some patients develop multi-system organ failure during the course of this disease and that it cannot currently be determined who will develop multi-system organ failure. He further indicated that whether a patient develops organ failure is not related to the timing of the diagnosis. In other words, some people may develop multiple organ failure at the onset of the infection while some may not develop it until a week later. Anderson also stated that some people never develop organ failure and that he had treated a patient with much more extensive infection who did not develop organ failure and who survived the infection.

{¶ 23} Tina Lykins initiated suit against MVH, MacLean, Chance, and Kepler. Extensive discovery was conducted, and the case was tried before a jury during a four-week trial. Following trial, the jury rendered a verdict in favor of all the defendants, and judgment was rendered accordingly. From this judgment, Lykins appeals.

## II

{¶ 24} Lykins' first assignment of error states as follows:

{¶ 25} "The defense committed reversible error in closing argument."

{¶ 26} In this assignment of error, Lykins focuses on the alleged misconduct of defense counsel during closing argument. Specifically, she contends that defense counsel acted improperly because he (1) suggested that Tina and David Lykins were negligent; (2) violated "the Golden Rule"; and (3) "breached the permissible bounds of law" because he "appealed to bias and prejudice * * * by repeating a call to fate and abandonment of the civil justice process." Also, Lykins argues that the trial judge erred by classifying objections made during closing arguments as a "pet peeve."

{¶ 27} It is well settled that trial counsel is afforded wide latitude during the presentation of closing arguments. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph two of the syllabus. Whether counsel has exceeded the proper bounds of closing argument is a discretionary determination to be made by the trial court. Id. at paragraph three of the syllabus. Absent an abuse of discretion, the trial court's decision will not be reversed on appeal. Id.

{¶ 28} We begin with the claim that even though the trial court granted a directed verdict in favor of Lykins on the issue of comparative negligence, defense counsel continually attempted to show that the Lykinses were negligent for failing to return to the emergency room in a more timely manner. Lykins refers to numerous passages from the transcript of the defense's closing. The essence of the argument in these cited passages relied upon the fact that, after his initial discharge from MVH, David Lykins did not return to the hospital for approximately 19 hours.

{¶ 29} From our review of the entire closing argument, we conclude that counsel's argument was not intended to, and did not, imply that David or Tina Lykins were at fault for failing to return to the hospital until the next day. Indeed, defense counsel specifically informed the jury that "Mr. and Mrs. Lykins are not considered to be at fault[,]" and that he was "[n]ot suggesting that in any way, shape or form."

{¶ 30} Instead, it appears to us that the argument was meant to emphasize the testimony of defense experts. Specifically, the defense experts indicated that the doctors were not unreasonable in their failure to diagnose Necrotizing Fasciitis/Myositis during Lykins's initial emergency room visit because he did not present with classic symptoms. The defense experts testified that the diagnosis reached at the time of the first visit was reasonable, given the clinical findings present at that time. Their testimony suggested that by the time Lykins did return, the doctors were able to make the diagnosis, due to the worsening of his condition and the additional symptoms presented. Defense counsel's argument appears to have been calculated to impress upon the jury that there was ample time for the disease to progress to a level sufficient for diagnosis during the time between the initial discharge and Lykins's return to the hospital and that it could have progressed so far as to be fatal. Based upon our review of the record, we find no merit to Lykins's claim that this argument was improper or unfairly prejudicial.

{¶ 31} We next address the allegation that defense counsel violated the "Golden Rule." Lykins contends that defense counsel committed prejudicial error when he asked the jurors to "put yourselves in the shoes of the caregivers." This type of argument, commonly referred to as the "golden-rule" argument, exists where counsel appeals to the jury to abandon their position of impartiality by imagining themselves in the position of one of the parties. *Boop v. Baltimore & Ohio RR.* (1963), 118 Ohio App. 171, 174, 25 O.O.2d 37, 193 N.E.2d 714. While the golden rule argument is no longer deemed prejudicial per se, this type of argument would be better avoided. *Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 775, 596 N.E.2d 500.

{¶ 32} In reviewing the opening statement by counsel, we are not persuaded that the cited passage resulted in any prejudice to Lykins. Counsel for Lykins made an objection to the statement, which was overruled. Defense counsel then continued on and stated: "And what I mean by put yourselves in the shoes of the caregivers is simply, when you're judging my clients * * *, judge them from the information they knew or should have known—from the information they knew or should have known—as the caregivers at that time. * * * At the time the care was given."

{¶ 33} Counsel stressed that he was not urging the jurors to judge the case based upon sympathy or compassion, but merely to base their judgment upon whether the doctors responded appropriately given the information available at the time they first examined David Lykins. At the oral argument of this appeal, counsel for MVH, who was also trial counsel, acknowledged that he wished that he had used different words to have expressed the point he was making, so as to avoid any implication of a golden-rule argument. We agree that the point could have been made differently, in a way that would not have implicated the golden rule at all. Nevertheless, we understand the essential point defense counsel was making to have been aimed at persuading the jury to consider those matters that were known to the doctors at the time of the initial treatment and diagnosis, rather than a request to empathize with the doctors. The record does not demonstrate that the comments were so heinous or reprehensible that the jurors would be likely to abandon their position of impartiality or that Lykins would have been prejudiced by the statements. Therefore, we cannot say that the trial court abused its discretion by overruling Lykins's objection to this argument.

{¶ 34} Next, Lykins claims that defense counsel exceeded the bounds of permissible argument by making comments such as "bad things happen to good people" and "everyone dies," and by referring to "hindsight" and to death as "unavoidable." She contends that by making these comments, the defense was asking the jury to hold fate, rather than his clients, accountable. Along with this argument, Lykins complains that defense counsel "brutally and unfairly attacked" her experts. We find no merit to this contention.

{¶ 35} We have read the entire transcript and cannot say that these few references are prejudicial. Defense counsel was merely attempting to acknowledge that David Lykins was a good person, while denying that his clients were responsible for David's death. This is defense counsel's duty as an attorney—to defend his clients. Additionally, as noted in Part VII, below, we find that defense counsel's argument regarding Lykins's experts was merely an appropriate attempt to show bias and was therefore within the bounds of permissible argument.

{¶ 36} Finally, Lykins raises an argument with regard to the following statement made by the trial judge:

{¶ 37} "And the Court will entertain objections during close, but it's one of my pet peeves, and—a lot of objections during close. I'm going to tell you that. Make whatever record you need."

{¶ 38} Lykins contends that this "comment clearly put a chilling effect upon the absolute duty of [her] counsel to timely object." [2]

{¶ 39} The comment by the trial judge was made at a sidebar, and, therefore, was not heard by the jury. It is clear from the record that counsel for Lykins continued to make objections during the defense's closing argument. Moreover, Lykins fails to refer to any specific instance during closing argument where counsel wanted to object but was intimidated from doing so by the trial judge's "pet peeves" remark. Indeed, we note no obvious error on trial counsel's part with regard to raising objections during the defense's argument. Therefore, while we might conclude that the trial court would have been better advised not to have made the "pet peeve" remark, we do not find any prejudicial error arising therefrom.

{¶ 40} We have remarked previously, "It is the tradition in this legal community to avoid interrupting opposing counsel's closing argument if at all possible * * *." *State v. Luoma* (Dec. 7, 1990), Montgomery App. No. 10719, 1990 WL 197944. Thus, Lykins's attorney was already under some influence, by that tradition, to minimize objections during closing argument. We doubt that the trial judge's "pet peeve" remark added any significant pressure to keep objections to a minimum, or, for that matter, constituted much more than a judicial recognition of the tradition we alluded to in *State v. Luoma*.

{¶ 41} Lykins's first assignment of error is overruled.

## III

{¶ 42} The second assignment of error provides as follows:

{¶ 43} "The trial court committed prejudicial error when it prohibited the plaintiffs from introducing expert and fact witnesses at trial."

{¶ 44} Lykins contends that the trial court improperly excluded her from presenting certain witnesses at trial.

---

**2.** We note that Lykins also states that the objections she did make after the statement were "met with non-verbal disapproval by the Court" and that the trial court had received notice of a "serious medical condition" and was "obviously preoccupied causing the remark to probably not be meant." We have found nothing in the record to support these assertions; therefore, we ignore them.

{¶ 45} First, Lykins contends that the trial court abused its discretion by excluding the testimony of Matthew E. Levinson, M.D., who was named by the defense as an expert witness. According to Lykins, when Levinson's deposition was conducted, he provided testimony favorable to her case. Specifically, she claims that while answering a question posed by her counsel, Levinson stated: "well, then this would have to be an outright lie." Lykins argues that by this statement, Levinson intended to indicate that the defendants and defense counsel were being untruthful. Therefore, she contends that "she had a legal right and duty to present this damaging evidence of 'the lie' " to the jury.

{¶ 46} Lykins claims that during trial she "made it known that [she] would utilize the testimony of Dr. Levinson in [her] case in chief." However, she claims that the defense objected and stated that Levinson would be produced live at trial. She further argues that she "proffered the videotaped deposition as part of [her] case in chief" but that the trial court did not permit its introduction, based upon its finding that Levinson was not unavailable to testify. When the defense did not present Levinson in its case, Lykins again attempted to introduce the deposition as rebuttal. The trial court again ruled that the deposition could not be used.

{¶ 47} Lykins fails to cite, and we cannot find, any portion of the record supporting her claim that defense counsel stated that Levinson would be produced live at trial. Likewise, there is no citation to the record, and we did not find evidence that Lykins attempted to introduce the deposition of Levinson during her case in chief. Instead, it appears that she attempted to introduce it merely as an exhibit following her announcement that she had rested her case in chief. Additionally, we note that defense counsel did not make any reference to Levinson's testimony during opening statement or any other portion of the defense case. While the issue of whether the deposition could be used during the rebuttal portion of Lykins's case was raised, the record is devoid of any ruling on the matter.[3]

{¶ 48} It appears that the trial court simply did not issue any ruling on the matter and that Lykins did not make any attempt to introduce the deposition during her rebuttal.

{¶ 49} Furthermore, upon reading the portions of the deposition surrounding the cited answer, we do not come to the same conclusion as Lykins regarding this testimony. The following exchange took place during testimony regarding

---

3. In her appellate brief, Lykins notes that the ruling regarding this issue was not made on the record, and she states that the record will be supplemented with the ruling pursuant to App.R. 9(A). Lykins has failed to supplement the record regarding this matter.

whether David Lykins had a fever, and whether this was indicated on the patient history taken by Chance and MacLean during the March 2 visit:

{¶ 50} "Levinson: The physician is the one responsible. So no matter what other people say, if they document that this is not part of the patient's illness, I have to assume that's correct.

{¶ 51} "Q: Okay. Why would you assume that he's correct, and everyone else, who reported or written [sic] their paperwork that you have read or testified, is wrong?

{¶ 52} "A: Well, then this would have to be an outright lie."

{¶ 53} After reading the above passage, as well as several pages surrounding it, we conclude that Levinson did not accuse any of the defendants of lying. Instead, his testimony indicated his reasons for his belief that the findings of MacLean and Chance were correct.

{¶ 54} Based upon the record before us, we cannot say that the trial court abused its discretion by excluding the deposition of Levinson. Furthermore, even if the trial court had abused its discretion, we would find that any error was not prejudicial.

{¶ 55} Lykins next contends that the trial court erred by excluding the testimony of her expert witness, Arthur Shorr. Upon proffer, Shorr testified that he is a "graduate-prepared hospital administrator." He testified that MVH was derelict in its duty to comply with the standards set forth by the Joint Commission for Accreditation of Healthcare Organizations (JCAHO) with regard to the retention of medical records. Specifically, in this case, Shorr's testimony centered on the hospital's failure to retain the urgent-care form and the hospital telephone-record form. He testified that it is necessary to get all of these records with information regarding a patient to the treating doctors and that the failure to keep these type of records would result in the issuance of a violation from JCAHO.

{¶ 56} The admission of expert testimony is a matter vested within the sound discretion of the trial court. *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105.

{¶ 57} Lykins contends that Shorr's testimony, which was relevant to the issue of MVH's failure to abide by JCAHO policies, shows that the failure of the defendants to establish, maintain, and enforce those policies was the proximate cause of David Lykins's death. However, upon review of the proffered testimony, we note that Shorr stated that he would not give testimony regarding medical standards or the deviation from medical standards of care. Indeed, when

specifically asked whether the deviation from JCAHO standards had an adverse affect upon David Lykins, Shorr declined to provide an opinion.

{¶ 58} While Shorr's testimony does establish that MVH failed to maintain records, it does not establish that its failure was related to the inability to diagnose Necrotizing Fasciitis/Myositis on March 2, or to David Lykins's course of treatment. Therefore, the testimony had no relevance to the issue of duty and breach. Accordingly, we cannot say that the trial court abused its discretion by excluding this testimony.

{¶ 59} We now turn to Lykins's claim that the trial court erred by excluding the testimony of Donna Batdorff. On proffer, Batdorff testified that she is the co-founder and director of the National Necrotizing Fasciitis Foundation, which operates an Internet website that provides information about the disease, as well as access to a support group. Batdorff testified that she is a survivor of the disease. She testified about how she contracted the disease and her course of treatment. She testified that she had a portal of entry—a cut on her finger—and that when she presented to an emergency room, she exhibited a red, swollen arm, flu symptoms, vomiting, diarrhea, and extreme pain. She further testified that many people survive the disease.

{¶ 60} Lykins contends that Batdorff's testimony "about the statistics and number of survivors in the nation was essential to the case to rebut the defendants' unfair and untrue arguments that [the disease] is so rare (as to be unavoidably fatal), everyone dies, everyone has the same symptoms, there is always redness, there are always portals of entry, no effective treatment, patient attribution, norm bias, etc." She further contends that the testimony was relevant to rebut the claim that "everyone who doesn't die is permanent [sic] and substantially disabled."

{¶ 61} First, we find that Lykins's characterization of the defense arguments is misleading. From our review of the record, we conclude that the defense did not make the claims cited above. Indeed, the defense presented competent expert testimony regarding the treatment of the disease and the fact that people can survive.

{¶ 62} Second, we fail to see how Batdorff's testimony is relevant. David Lykins had no portal of entry; Batdorff did. Batdorff contracted the disease in a limb, while David had it in his chest. Batdorff presented to the emergency with redness and swelling, which was not initially present in David. Batdorff survived; David did not.

{¶ 63} We further note that Batdorff was unable to provide any statistics regarding survival rates. Additionally, she testified that as a result of the disease process her finger was amputated and her arm was badly scarred. Therefore,

her testimony was incompetent to rebut the defense claim that many people who survive have a disability.

{¶ 64} We agree with the trial court that the testimony proffered from Batdorff was not relevant to this case. Therefore, we conclude that the trial court did not abuse its discretion by excluding her testimony.

{¶ 65} Lykins also contends that the trial court erred by preventing her from presenting evidence regarding three other cases of Necrotizing Fasciitis at MVH. This argument is not clear. However, it appears that she contends that evidence that there have been three other cases of this disease that have been presented to MVH is relevant to the issue of the defendants' credibility, because it undermines their argument that the disease is so "rare as to be virtually unknown."

{¶ 66} Again, Lykins's claim that the defense incorrectly argued that the disease is so rare as to be "virtually unknown" is disingenuous. From our review of expert testimony contained in the record, it is evident that the disease is rare—with only approximately 3,000 cases occurring per year in the United States—and that it is a disease that many, if not most, doctors never see or treat. Therefore, we fail to see how this evidence would undermine the credibility of the defendants.

{¶ 67} "Prior occurrences are sometimes relevant 'to show that a party knew or had notice of a dangerous condition.' '[I]n order for such occurrences to have been admissible to show prior knowledge on the part of [the defendant], these incidents must have occurred under circumstances substantially similar to those in [the plaintiff's case].' The trial court has the discretion to determine whether the prior occurrences were substantially similar to the accident in question. Furthermore, the proponent of prior occurrence evidence has the burden of showing the substantial similarity of the circumstances." *Lumpkin v. Wayne Hosp.,* Darke App. No. 1615, 2004-Ohio-264, 2004 WL 102860, ¶ 13.

{¶ 68} We note that Lykins has failed to set forth any details regarding the three other cases of the disease. Indeed, it appears from her argument that at least one of the three was not the same disease that David contracted, and we cannot tell whether the other two patients had portals of entry. It further appears that none of the same doctors or nursing staff who attended David attended the other patients. We find no basis for the introduction of this evidence and agree with the trial court that this evidence would be more prejudicial than probative of any issue in this case.

{¶ 69} Finally, Lykins contends that the trial court improperly excluded the testimony of the CEO and other employees of MVH. She contends that their

testimony was necessary to "establish the substandard care given to David Lykins, as well as the failure to maintain" standards and records, "all of which are relevant to the issue of medical negligence."

{¶ 70} Other than to state that many of the employees have been deposed, Lykins fails to set forth the names of these proposed witnesses. Therefore, we will address this issue with regard to the CEO and the deposed employees.

{¶ 71} The record reveals that Lykins deposed more then 25 MVH employees during the course of discovery. A review of those depositions shows that these employees did not have any contact with David or Tina Lykins and did not have knowledge about the case. Furthermore, there is no support for the claim that these employees or the CEO presented any testimony regarding the standard of conduct or deviation therefrom. Additionally, we have not found any evidence in the record to indicate that the failure of the defendants to maintain the records, specifically the urgent-care referral form or the telephone-message form, impacted David's care or outcome. Therefore, we find no abuse of discretion in the trial court's decision to exclude this evidence.

{¶ 72} The second assignment of error is overruled.

## IV

{¶ 73} Lykins' third assignment of error states as follows:

{¶ 74} "The rulings of the trial court during the pre-trial motions and at trial which prohibited the use of JCAHO standards, Miami Valley Hospital rules, regulations, protocols and other matters in establishing the standards of care of defendants, substantively or for credibility upon cross-examination, especially as to MVH, was prejudicially erroneous."

{¶ 75} Lykins contends that the trial court abused its discretion by failing to admit the following evidence: (1) JCAHO guidelines; (2) MVH policies and procedures; and (3) records kept by the Montgomery County Health Department, the Ohio Department of Health, and the Centers for Disease Control, regarding Streptococcus A.

{¶ 76} A trial court has broad discretion in determining whether to admit or exclude evidence. *Lumpkin,* supra. Absent an abuse of that discretion, rulings on the admissibility of evidence will not be reversed. Id. The term "abuse of discretion" implies that the decision of the trial court is arbitrary, unreasonable, or unconscionable. Id.

{¶ 77} We begin with the issue of whether the trial court erred by denying Lykins's request to introduce the JCAHO guidelines and the MVH policies and procedures. Lykins argues that these documents are relevant to the

issue of standard of care because the failure to properly maintain records and to follow standard procedures resulted in the failure to diagnose David's disease. She contends that had the defendants kept the urgent care and telephone forms, and complied with the instructions of the urgent-care physician, they would have performed the appropriate test and found the infection.

{¶ 78} The physician at urgent care sent David to MVH with a referral form stating that David had severe left shoulder pain and requesting the MVH doctors to rule out septic arthritis. The followup telephone call from the urgent-care physician to the emergency room of MVH, recorded on the telephone form, merely repeated the request to rule out septic arthritis. These forms were subsequently lost or destroyed.

{¶ 79} Again, while there is evidence and testimony to indicate that the hospital failed to properly maintain the urgent-care form and the telephone form, there is no evidence relating that failure to the fact that David was not diagnosed with Necrotizing Fasciitis/Myositis during his first visit to the emergency room. Indeed, from the record, there can be no doubt that the defendant doctors did act in accord with the wishes of the urgent-care physician. Specifically, they examined David and determined that he did not have septic arthritis in his shoulder. More important, it is clear from the record that David did not have septic arthritis. There is no connection between the loss of these forms and the care rendered; therefore, the trial court did not abuse its discretion by refusing to admit the requested exhibits.

{¶ 80} Lykins also contends that the trial court abused its discretion by denying her request to introduce records regarding an "outbreak" of Necrotizing Fasciitis, which she claims occurred in southwest Ohio around the time of David's case. Lykins claims that the evidence of this outbreak is contained in records from the Centers for Disease Control, as well as records from the Ohio and Montgomery County Departments of Health. While Lykins fails to set forth any argument in her appellate brief to support this claim, our review of the transcript reveals that her argument is based upon the contention that the MVH physicians should have been aware of the possibility that David had Necrotizing Fasciitis/Myositis, because they should have been aware of the records from the various health organizations.

{¶ 81} There are five exhibits relevant to this argument—exhibit numbers 47 through 50.[4] A portion of exhibit 47 was excluded because it involved information regarding a different type of disease process. Exhibits 48 and 50 were both admitted by the trial court. The only exhibit rejected, number 49, was a report

---

4. Again, counsel for Lykins fails to cite the record with regard to this claim or to identify the specific exhibits.

from the Centers of Disease Control. This report was made in regard to Group A Streptococcus, which causes Necrotizing Fasciitis/Myositis; however, the report covered a mix of diseases caused by this bacteria. Furthermore, the report involved only Butler, Clermont, and Hamilton Counties in southwestern Ohio and did not purport to include any other counties. We find no error in the trial court's decision regarding these exhibits.

{¶ 82} The third assignment of error is overruled.

V

{¶ 83} Lykins's fourth assignment of error is as follows:

{¶ 84} "It was prejudicial error for the court to allow defense counsel to play portions of the videotape on David Lykins' life to the jury prior to their voir dire."

{¶ 85} In this assignment of error, Lykins complains of prejudice resulting from the defense's use, during voir dire, of a videotape she had prepared that "attempted, in some small way, to ethically, professionally, and tastefully show, without undue sympathy, David Lykins as a husband, father, brother, son, fire captain, police chief, and generally an industrious family man." According to the trial court, which reviewed the tape prior to trial, the tape was one-hour long. It also contained an additional three minutes of photographs, put into videotape format, with a sound track of a song called "In the Arms of the Angels." During voir dire, counsel for the defense indicated his intent to play a portion of the tape for the jury before continuing his examination of the jurors. Lykins raised an objection to the playing of the tape based upon her claim that the defense should play the entire tape rather than just portions of it. The objection was overruled by the trial court, and the defense played approximately 15 minutes of the tape for the jury.

{¶ 86} Lykins contends that permitting the defense to play only a portion of the tape was prejudicial. First, she complains that the defense fast-forwarded the videotape "in a cartoon-like Gumby fashion," thereby distorting the evidence. Second, she claims that the defense was able to "mark for removal" the jurors who did disclose a tendency toward sympathy, and thus caused the loss of "valuable objective, fair, prospective jurors." Finally, she claims that the use of the film did not merely erase all juror sympathy, but also made the case "somewhat surreal" and "dehumanized" the decedent.

{¶ 87} The conduct of voir dire is left to the broad discretion of the trial court, and decisions related thereto will not be reversed absent an abuse of discretion by the trial court. *Gwen v. Regional Transit Auth.*, Cuyahoga App. No. 82920, 2004-Ohio-628, 2004 WL 253484, ¶ 38. In this case, we have reviewed

the entire voir dire and note that the most we can determine from this record is that defense counsel did not play the entire tape to the jury. There is no way for us to assess whether it was played in fast-forward or slow-motion mode. Indeed, there is no indication that Lykins raised any objections with regard to the speed at which the tape was played. Furthermore, the mere fact that defense counsel was able to "take the sting out" of the presentation of the tape or to identify potential jurors who might display undue sympathy toward Lykins does not equate to a finding that the trial court abused its discretion with regard to this matter. In fact, weeding out jurors who might be unduly sympathetic to one side is a permitted purpose for voir dire. Upon the record before us, we find no abuse of discretion in the trial court's decision to permit the tape to be played by defense counsel during voir dire.

{¶ 88} Accordingly, the fourth assignment of error is overruled.

## VI

{¶ 89} The fifth assignment of error states as follows:

{¶ 90} "The court erred when it failed to enter judgment of default against the defendants jointly and severally, due to their reprehensible answer, not filed in good faith, or at least award some appropriate and meaningful sanctions."

{¶ 91} Lykins contends that the trial court should have entered a default judgment against the doctors and the hospital because the answer filed on their behalf was not filed in good faith and because it consisted of only a general denial. Thus, in her argument, Lykins contends that she is entitled to summary judgment and requests that this court enter judgment in her favor and remand the issue to the trial court for a hearing on damages.

{¶ 92} Civ.R. 55(A) provides that default judgment may be awarded when a defendant fails to make an appearance by filing an answer or otherwise defending an action. *Davis v. Immediate Med. Serv., Inc.* (1997), 80 Ohio St.3d 10, 14, 684 N.E.2d 292, citing Civ.R. 55(A). However, it is "a basic tenet of Ohio jurisprudence that cases should be decided on their merits." *Perotti v. Ferguson* (1983), 7 Ohio St.3d 1, 3, 7 OBR 256, 454 N.E.2d 951. Furthermore, Civ.R. 8(F) requires a court to liberally construe all pleadings "as to do substantial justice."

{¶ 93} In this case, an answer was filed. However, the trial court made the following finding with regard to the answer: "Defendant's Answer, while reprehensible and precariously close to failing to plead as provided by the Civil Rules, does not warrant default judgment. Defendants' general denial of paragraphs one through fourteen in the Complaint is evidence of little diligence on Defendants' part and this Court advises Defendants to exercise professional discretion when submitting such documents."

{¶ 94} The trial court denied the motion for default judgment on the basis that voluminous discovery had been conducted and that default judgment is best reserved for disposing of uncontested cases.

{¶ 95} We find no abuse of discretion in the trial court's decision to deny default judgment.

{¶ 96} The fifth assignment of error is overruled.

## VII

{¶ 97} The sixth assignment of error states:

{¶ 98} "The trial of the case was prejudicially flawed and against the manifest weight of the evidence because of the misconduct of the defense and their counsel."

{¶ 99} In this assignment of error, Lykins claims that the case was prejudicially flawed because of numerous instances of misconduct on the part of the defendants and their counsel.

{¶ 100} We deal first with Lykins's claim that Chance and MacLean testified dishonestly during trial. As background for this claim, we note that Lykins deposed both Chance and MacLean. During their depositions, Lykins provided copies of the notes made by the triage nurse and asked Chance and MacLean to read the notes. Neither was able to do so. When questioned at trial, Chance and MacLean testified that they could read the notes. Lykins states that the testimony by Chance and MacLean was an "obvious fabrication." We disagree.

{¶ 101} A reading of the depositions reveals that Chance and MacLean did indicate that they could not read the copy of the nursing notes provided by Lykins. No other copies of the notes were on hand. A review of the trial transcript reveals that when requestioned regarding the notes, both doctors indicated that they had subsequently reviewed different copies of the notes, that the different copies were more legible, and that they both could read the notations. From our review of the record, the claims of Chance and MacLean that they were able to read the triage nurse's notes at trial, despite having been unable to read the copies shown them at their depositions, appear plausible. While the plaintiffs may have enjoyed an opportunity to argue to the jury that Chance and MacLean were less credible witnesses because of this circumstance, we do not find it to be a basis for reversal.

{¶ 102} Lykins next complains that "the nature and appearance and testimony of Dr. Quazi Hossain at trial was a complete surprise" to her and that counsel for the defense "feigned no knowledge of the same." During trial,

Lykins called Dr. Quazi Hossain as a witness. Hossain appeared with his counsel and requested a conference with the trial judge. During the conference, Hossain's counsel informed the court that Hossain would not render any expert testimony. While Hossain did testify at trial, the trial court refused to require Hossain to provide expert testimony.

{¶ 103} It is not clear from her argument whether Lykins contends that defense counsel was responsible for Hossain's failure to testify as an expert, or whether she contends that the trial court erred by not requiring him to testify at trial as an expert.

{¶ 104} We have not found, and Lykins has failed to cite, any authority to indicate that a trial court can force a witness to provide expert opinions. Hossain indicated that he was not qualified to testify as an expert in this matter. Thus, we see no basis for compelling such testimony. Also, we have found no evidence that defense counsel was involved with Hossain's decision not to provide expert opinions. Hossain was represented by separate counsel who clearly acted as his advisor with regard to this matter. There is no indication that defense counsel had any involvement with Hossain other than to depose him, at which time he provided no expert opinions. The record indicates that Lykins was made aware by counsel for Hossain, as much as a year prior to trial, that Hossain did not intend to provide expert testimony during trial. We cannot say that the trial court erred by failing to compel Hossain to testify as an expert, and we cannot say that defense counsel acted improperly with regard to this witness.

{¶ 105} Lykins's next claim centers on two of David's treating physicians, Dr. Jose Crespo and Dr. Gary Anderson. She seems to be implying that because these physicians refused to speak privately with her attorney, they were somehow influenced by defense counsel. She also implies that these doctors did not testify truthfully. Finally, she claims that defense counsel improperly obtained a copy of confidential correspondence from her counsel to Drs. Crespo and Anderson.

{¶ 106} First, we find nothing in this record to support the claim that the doctors were improperly influenced by defense counsel or that they provided dishonest testimony. Second, there is nothing to support the claim that the correspondence to which Lykins refers was confidential, or that it was improperly obtained by counsel. The letter contains what appears to be a veiled threat by Lykins's counsel that these doctors would be included in the suit if they did not talk to plaintiffs' counsel. This fact alone explains their unwillingness to discuss the case without their counsel present—something to which they are entitled. We find no merit to any of the issues raised with regard to these physicians.

{¶ 107} We next turn to the claim that the trial court inappropriately "shut down" discovery and note that once again, counsel has failed to make appropriate citations to the record. From our review of the record, we find that the trial court did enter an order limiting the number of requests for admissions and interrogatories that Lykins could serve upon the defense. Initially, Lykins made 293 requests for admissions and the same number of interrogatories. The trial court found this to be unduly burdensome. We agree. Furthermore, we note that Lykins conducted approximately 60 depositions and that discovery lasted approximately two years. We cannot reach the conclusion that discovery was shut down.

{¶ 108} Lykins also argues that the trial court permitted defense counsel to conduct improper cross-examination of her experts. Specifically, she objects to the fact that defense counsel elicited information from two of her expert witnesses concerning their "personal relationship with plaintiffs' counsel." Lykins further complains that defense counsel attempted to demonstrate that the remainder of her experts were "hired guns."

{¶ 109} From our review, it appears that defense counsel acted properly with regard to the cross-examination of Lykins's experts. The evidence indicates that one of the experts was a close friend of plaintiffs' counsel and had accompanied him on several trips. The second expert testified that plaintiffs' counsel had made contributions to the witness's political campaign. As for the remainder of the experts, defense counsel elicited information regarding the fact that they were all associated with an expert-witness service.

{¶ 110} This cross-examination is proper. Pursuant to Evid.R. 607, the defense was entitled to impeach the credibility of Lykins's witnesses. Furthermore, Evid.R. 616(A) permits a witness to be impeached by showing "[b]ias, prejudice, interest, or any motive to misrepresent * * *." We find no error with regard to this issue.

{¶ 111} Finally, Lykins asserts that the judgment is against the manifest weight of the evidence. In support, she claims that the facts were uncontested and that "testimony which contradicts such facts, even if contested by the defense, is still sufficient to support a verdict in [her] favor."

{¶ 112} In reviewing a claim that the evidence does not support a verdict, we are guided by the holding that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Furthermore, we must presume that the findings of the trier of fact are correct because the trier of fact is best able to

observe the witnesses and use those observations in weighing the credibility of the testimony. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 81, 10 OBR 408, 461 N.E.2d 1273.

{¶ 113} We begin with the observation that, despite Lykins's assertion to the contrary, this case was anything but uncontested. There are some facts that are uncontradicted: David contracted a disease, he went to the MVH emergency room, he was sent home with a diagnosis of shoulder sprain, his condition worsened, he returned to MVH the next day, he was diagnosed and treated, and he subsequently died. However, the transcript is more than 4,100 pages in length and is filled with contested matters. Both sides presented numerous expert and fact witnesses. Thus, we are required to determine whether, after reviewing the entire record, the judgment is not supported by competent, credible evidence.

{¶ 114} The defense produced numerous experts, including Dennis Stevens, M.D., and David Talan, M.D. Dr. Stevens is board certified in infectious diseases and internal medicine and has conducted extensive research and writing on Necrotizing Fasciitis and Necrotizing Myositis. Dr. Talan is board certified in emergency medicine, infectious diseases, and internal medicine. He has also conducted research on these diseases.

{¶ 115} It is undisputed that David did not have septic arthritis of his shoulder. The defense witnesses testified that when David presented to the emergency room on March 2, he did not have the clinical signs of Necrotizing Fasciitis or Necrotizing Myositis; specifically, he did not have swelling, redness, discoloration, or heat on his skin, and he had no fever.[5] Additionally, David's vital signs were essentially normal on that date. The experts further opined that the tests that Lykins claims were required were, in actuality, not indicated by David's presentation or history. Furthermore, the experts agreed that the diagnosis of strain/sprain of the left shoulder was reasonable given David's symptoms.

{¶ 116} The proper standard of care in a medical malpractice case was laid out by the Ohio Supreme Court in *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673. In that case, the court stated:

{¶ 117} "Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done

---

5. Although Lykins argues that David informed the emergency room staff that he had a fever and had taken medicine to reduce the fever, there is competent evidence in the record to indicate that his temperature was normal when checked and that David did not inform the defendants that he had taken medicine.

under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." Id., 46 Ohio St.2d at 131, 75 O.O.2d 184, 346 N.E.2d 673.

{¶ 118} The defense experts testified that none of the defendants breached the standard of conduct. Given the evidence introduced by the defense, we conclude that a reasonable juror could find that Lykins had not demonstrated that the defendants had breached the standard of conduct by failing to diagnose Necrotizing Fasciitis/Myositis during David's first visit to MVH. There is competent, credible evidence to suggest that David's diagnosis of strain/sprain on March 2 was reasonable and that the proper diagnosis could not be made until the following day, when the signs of discoloration and swelling appeared. There also is evidence that Dr. Kepler was not involved in the care or treatment of David, and that his conduct was not improper and had no effect on David's outcome.

{¶ 119} Based upon the record, we conclude that the judgment is not against the weight of the evidence. Therefore, the sixth assignment of error is overruled.

## VIII

{¶ 120} The seventh assignment of error provides as follows:

{¶ 121} "The trial court committed prejudicial error on pleadings, motions and instructions concerning the medical records and loss, spoliation and destruction of same."

{¶ 122} Lykins contends that she should have been permitted to maintain a separate cause of action for the loss or destruction of the urgent-care referral form and the telephone-message form. She also claims that the jury should have been instructed to presume negligence based upon the failure of MVH to retain those records.

{¶ 123} The elements of a claim for interference with or destruction of evidence are "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Bae v. Dragoo & Assoc., Inc.,* 156 Ohio App.3d 103, 2004-Ohio-544, 804 N.E.2d 1007, ¶ 26.

{¶ 124} The record is devoid of any evidence that MVH or any of its physicians or employees willfully destroyed these forms. Furthermore, it cannot be said

that the lack of these forms disrupted the presentation of Lykins's case. The jury was made aware of the existence and the subsequent loss or destruction of these forms and the content thereof and was free to consider or to disregard the matter in reaching its verdict.

{¶ 125} We conclude that Lykins has failed to present evidence to establish a claim for spoliation of evidence.

{¶ 126} We have found no evidence in the record to demonstrate any relationship between the failure to retain these records and the treatment of David Lykins; in other words, the timing of the diagnosis and David's death were not caused by the hospital's failure to keep those forms. It is clear from the record that Chance and MacLean ruled out septic arthritis in David's shoulder, as requested by the urgent-care physician. It is further undisputed that David did not have septic arthritis of the shoulder.

{¶ 127} Last, Lykins has failed to cite any competent authority for her assertion that the jury should have been instructed to presume the negligence of, or shift the burden of proof to, the defendants based upon the loss of these records. Therefore, we conclude that the trial court did not err by failing to give such an instruction.

{¶ 128} The seventh assignment of error is overruled.

IX

{¶ 129} The eighth assignment of error provides:

{¶ 130} "The trial court granted prejudicially erroneous rulings on plaintiffs' pretrial (summary judgment) (in limine) and directed verdict motions that denied the plaintiffs' right to remedy and prejudiced their case for trial."

{¶ 131} Lykins contends that the trial court improperly rendered summary judgment in favor of the defense. She also contends that the trial court erroneously sustained motions in limine and requests for directed verdicts made by the defense. Lykins further claims that the trial court erred by denying her motion for directed verdict on the issues of loss of chance and joint and several liability. Counsel for Lykins has completely failed to comply with the requirements of App.R. 16(A)(3) and (D) by neglecting to include any references to the portion of the record demonstrating these alleged errors. This has been an ongoing and consistent problem throughout Lykins's appellate brief. Counsel should note that compliance with the Rules of Appellate Procedure is mandatory and that the failure to adhere to these rules may result in sanctions or adverse rulings.

{¶ 132} We begin with the claim that the trial court erred by rendering summary judgment in favor of the defense. This claim is directed to the fact that the trial court dismissed counts four, five, six, seven, eight, nine and ten of Lykins' complaint pursuant to a motion for summary judgment filed by the defense.

{¶ 133} On appeal, a reviewing court conducts a de novo review of a trial court's summary judgment entry. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Civ.R. 56(C) provides that summary judgment is proper when (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, viewing the evidence most strongly in favor of the nonmoving party, that reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201.

{¶ 134} In counts four and five of her complaint, Lykins raised a claim for the intentional infliction of emotional distress. These allegations appear to center on Lykins's argument that Chance and MacLean's failure to properly investigate the diagnosis made by the doctor at urgent care resulted in emotional distress to her and her children.

{¶ 135} To prevail on a claim for intentional infliction of emotional distress, a plaintiff must show the following: (1) that the defendant intended to cause the plaintiff serious emotional distress; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress. *Phung v. Waste Mgt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286. Extreme and outrageous conduct is conduct that goes beyond all possible bounds of decency and is so atrocious that it is "utterly intolerable in a civilized community." *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 375, 453 N.E.2d 666.

{¶ 136} The trial court found that Lykins failed to present any evidence to demonstrate that the defendants, by failing to diagnose Necrotizing Fasciitis/Myositis on March 2, intended to cause serious emotional distress. Furthermore, the trial court found that while the issue of the professional competence of the defendants is a matter for the jury, there is nothing in the record to demonstrate conduct so extreme or outrageous as to go beyond all human decency. We must agree and conclude that the trial court did not err in rendering summary judgment in favor of the defendants on this issue.

{¶ 137} In count six of her complaint, Lykins alleged a cause of action for loss of consortium. The trial court rendered summary judgment in favor of the defendants upon this issue, based upon its finding that Lykins's cause of

action for loss of consortium was included in her claim for wrongful death set forth in count two of her complaint, and thus could not be maintained as a separate action. See R.C. 2125.02(B). We disagree.

{¶ 138} Lykins was entitled to maintain a loss-of-consortium action for two separate periods of time. First, she suffered a loss of consortium for the two weeks that David survived after diagnosis, during which time he was hospitalized and completely disabled. Second, she suffered a loss of consortium following David's death.

{¶ 139} While we find no error in the trial court's decision insofar as it regards the time period following David's death, we do find that it was error to dismiss the loss-of-consortium claim for the two-week period he was in the hospital as that time period is not covered by the claim for wrongful death but rather is for damages resulting from the alleged malpractice. However, since the loss-of-consortium claim for that two-week period is derivative of the claim for medical malpractice, and since the jury determined that such claim was without merit, we find that any error was harmless.

{¶ 140} For her seventh count, Lykins claimed that the defendants breached their fiduciary duty to David. It is clear from reviewing this count that it is based upon her claim for malpractice.

{¶ 141} The Ohio Supreme Court of Ohio has held that a patient's action for breach of contract arising out of his physician's negligence is one based in malpractice and not contract. Cf. *Ratcliffe v. University Hosp. of Cleveland* (Mar. 11, 1993), Cuyahoga App. No. 61791, 1993 WL 69553. Lykins raised a claim for malpractice in count one of her complaint. "[T]herefore, [Lykins's] claim for breach of fiduciary duty by a physician is a medical claim under R.C. 2305.11(D)(3)." Id. Thus, the trial court did not err in rendering summary judgment on this claim.[6]

{¶ 142} The eighth count of the claim raises an allegation that MVH was negligent and/or reckless in its hiring, policies, and standards based upon the contention that MVH failed to implement policies with regard to hiring and training.

{¶ 143} Lykins did not oppose the motion for summary judgment on this issue, and the trial court found that she failed to establish the required element that MVH had actual or constructive knowledge of the incompetence of any of the persons involved with this case. See *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 680 N.E.2d 161. We find no error in the trial court's decision.

---

6. We note that Lykins did not oppose summary judgment on this count.

{¶ 144} The ninth count of the complaint contained a claim for the refusal to timely provide medical records pursuant to R.C. 3701.74. The trial court found that the records were provided in a timely manner and that this claim was thus rendered moot. We conclude that this decision was correct.

{¶ 145} Finally, in her tenth count set forth in her complaint, Lykins made a civil claim for reckless homicide. Lykins, again, did not oppose summary judgment on this claim. The trial court found that there was no basis for this claim. We agree. Indeed, we are somewhat dumbfounded by counsel's attempt to bring a claim for which there is no basis in law and for which there is no showing of a good-faith attempt to change the law.

{¶ 146} We next turn to Lykins's claim that the trial court improperly granted the defendants a directed verdict on "several causes of action" and note that we find only one instance in which the trial court granted a directed verdict in favor of the defense. This was made with regard to the issue of whether MVH could be held liable for any negligence of Dr. Kepler.

{¶ 147} Civ.R. 50 controls motions for directed verdicts and states:

{¶ 148} "When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 149} When deciding such a motion, the trial court does not weigh the evidence but "assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68–69, 23 O.O.3d 115, 430 N.E.2d 935.

{¶ 150} We have examined the record and, like the trial court, find no legal theory under which "any negligence of Dr. Kepler could implicate the liability of the hospital." Kepler was not employed by the hospital; he was not present when David was examined, and he played no part in the examination and treatment of David. Additionally any comments made by Kepler to the MVH physicians in connection with the first trip to the emergency room was clearly made after David had already been examined and a diagnosis had already been reached.

{¶ 151} The eight assignment of error is overruled.

## X

{¶ 152} The ninth assignment of error raised by Lykins is as follows:

{¶ 153} "The court failed to properly apply or instruct the jury on the presumption of negligence in the case at bar and require the defendants to produce evidence solely within their possession."

{¶ 154} In this assignment of error, Lykins contends that the trial court should have shifted the burden of proof to the defense because of its failure to retain the urgent-care and telephone-message forms.

{¶ 155} Given our disposition of the eighth assignment of error above, we conclude that this argument is rendered moot. Accordingly, the ninth assignment of error is overruled.

## XI

{¶ 156} All of Lykins's assignments of error having been overruled, we affirm the judgment of the trial court.

Judgment affirmed.

GRADY and FREDERICK N. YOUNG, JJ., concur.