IKER et al., Appellants,

v.

ESTATE OF Dale JONES et al., Appellees.

Williams et al., Appellants,

v.

Estate of Dale Jones et al., Appellees.

[Cite as *Iker v. Estate of Jones,* 169 Ohio App.3d 457, 2006-Ohio-5393.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 21138 and 21158.

Decided Oct. 13, 2006.

458

Dennis A. Lieberman, for appellants Amy Iker, Russell Blake, and the estate of Sara Blake.

Christopher R. Conard, for appellant Shauna Laine Williams.

Robert M. O'Neal, for appellee Progressive Insurance Company.

Erin B. Moore, for appellee Auto–Owners Insurance Company.

Gordon D. Arnold, for appellee estate of Dale Jones.

---

WOLFF, Judge.

{¶ 1} Amy Iker and Shauna Williams appeal from a judgment of the Montgomery County Court of Common Pleas, which granted judgment after a bench trial in favor of Auto–Owners Insurance Company ("Auto–Owners") and Progressive Insurance Company ("Progressive") on the parties' coverage claims arising out of an automobile accident.

{¶ 2} The record reveals the following facts.

{¶ 3} On October 17, 2000, Dale Jones failed to obey a stop sign located at the intersection of Little Richmond Road and Johnsville–Brookville Road. Jones's

vehicle, a 1987 GMC S–15 truck, broadsided the car driven by Sara Blake. As a result, Blake's vehicle rotated and collided with a vehicle driven by Shauna Williams. Jones and Blake died as a result of the collision, and Williams sustained bodily injuries. Both Blake and Williams were minors. At the time of the accident, Blake's vehicle was covered by an uninsured/underinsured motorist policy with Allstate Insurance Company ("Allstate"). Williams's vehicle was covered under a policy with State Farm Insurance Company ("State Farm"). Jones had an automobile insurance policy with Progressive, although the truck he was driving was not listed on the policy. At that time, the truck was titled in the name of Bill Adams d.b.a. Bill Adams Auto Sales. Bill Adams Auto Sales had a policy of insurance with Auto–Owners.

{¶ 4} On July 6, 2001, Blake's mother, Amy Iker, both individually and as the administrator of Blake's estate, and Russell Blake, Blake's father (collectively, "Iker"), brought a wrongful death action against Jones's estate. They also brought claims against Bill Adams ("Adams") and Bill Adams Auto Sales, alleging that Adams was the owner of the truck that Jones had driven and that he had negligently loaned the truck to Jones. In an amended complaint, Iker added several insurance companies as defendants, including Allstate and Auto–Owners.

{¶ 5} On October 15, 2002, Williams and her parents filed a personal injury suit against Jones's estate, Bill Adams Auto Sales, Adams, and Iker. Williams also subsequently added several insurance companies as defendants, including Auto–Owners, Progressive, and State Farm.[1] On November 7, 2002, the two cases were consolidated.

{¶ 6} In 2003, the court granted summary judgment to Adams and Bill Adams Auto Sales, concluding that although a genuine issue of material fact existed regarding who owned the 1987 GMC S–15 truck, they were entitled to summary judgment on the negligent entrustment and respondeat superior claims against them. At the time of trial, Jones's estate, Auto–Owners, Progressive, and State Farm were the only remaining defendants.

{¶ 7} On December 6, 2004, Auto–Owners filed a motion to bifurcate the issue of insurance coverage from the negligence claims. The court granted the motion on February 16, 2005. On March 21, 2005, the court heard testimony on the ownership of the vehicle that Jones had driven, which was the only contested issue of fact relevant to insurance coverage. Jones's estate, Williams, and State Farm did not participate in the trial.

---

1. The insurers for the employers of Amy Iker, Williams, and Williams's parents were also named as defendants. Pursuant to *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, the trial court ultimately granted summary judgment to these insurers.

{¶ 8} On June 14, 2005, the court ruled that Adams had sold the truck to Jones and that Jones had taken possession of it. Applying the Ohio Uniform Commercial Code ("UCC"), R.C. Chapter 1302, the court concluded that Jones thus owned the S–15 truck on October 17, 2000, and consequently the vehicle was not covered by the Auto–Owners policy issued to Adams. The court further found that because Jones had failed to place the truck on his Progressive policy, the vehicle was not covered under that policy at the time of the accident. The court thus granted judgment in favor of Auto–Owners and Progressive. Iker and Williams appeal from that ruling, raising six assignments of error.

{¶ 9} Before turning to the assignments of error, we must address whether Williams has standing to appeal from the trial court's ruling. As noted by Auto–Owners, Williams did not participate in the trial at her request. Auto–Owners thus argues that Williams has waived her right to contest the trial court's ruling. Williams responds that in the name of judicial economy, it was "perfectly appropriate for one of the Plaintiffs' counsel to take the lead in trying the case. In this instance it was Plaintiff Iker's counsel." Upon review of the record, we agree with Auto–Owners that Williams waived her objections by failing to participate at trial. We find nothing in the record to support Williams's contention that Iker was acting on her behalf at trial.

{¶ 10} Turning to the assignments of error, we note that Iker contends that the issue before the trial court was simply competing claims of ownership or, in this case, lack of ownership. In reality, the trial court's inquiry involved a two-step process. First, the trial court was required to determine whether Adams had sold, rather than loaned, the truck to Jones. Second, if the court made the threshold finding that Adams had sold the vehicle to Jones (which it did), it was then required to determine who owned the vehicle for purposes of insurance coverage. Iker's assignments of error touch on both of these steps, and we will address them in an order that facilitates our analysis.

{¶ 11} VI. "The trial court's judgment is against the manifest weight of the evidence."

{¶ 12} In her sixth assignment of error, Iker claims that the trial court's conclusion that Adams had sold the S–15 pickup truck to Jones was against the manifest weight of the evidence.

{¶ 13} In reviewing a claim that the judgment is not supported by the evidence, we are guided by the holding that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; see *Lykins v. Miami Valley Hosp.*, 157

Ohio App.3d 291, 2004-Ohio-2732, 811 N.E.2d 124, at ¶ 112. "Furthermore, we must presume that the findings of the trier of fact are correct because the trier of fact is best able to observe the witnesses and use those observations in weighing the credibility of the testimony." *Lykins*, citing *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 81, 10 OBR 408, 461 N.E.2d 1273.

{¶ 14} According to the evidence and stipulations presented at trial, Dale Jones was an auto mechanic who operated a repair shop, as a sole proprietor, in a building leased from Bill Adams Auto Sales for $300 per month. The building was located at the rear of Adams's lot, and Jones routinely performed mechanical work on Adams's vehicles. Bill Adams Auto Sales buys and sells used cars. Jones had previously purchased at least two vehicles from Bill Adams Auto Sales: (1) a red 1986 Chevrolet S–10 pickup truck, for which Bill Adams had obtained a security agreement, and (2) a 1985 Chevrolet Suburban.[2] Both of those vehicles were insured by Jones's policy with Progressive.

{¶ 15} According to the parties' stipulations, Jones executed a written sales agreement (Used Vehicle Order form) with Bill Adams Auto Sales for the GMC S–15 pickup on May 11, 2000. He took possession of the S–15 immediately after executing the sales agreement. At the time of the October 17, 2000 accident, the certificate of title to the S–15 pickup was still in the name of Bill Adams Auto Sales. Although not the subject of a stipulation, it is undisputed that an insurance card for the policy issued by Auto–Owners to Bill Adams d.b.a. Bill Adams Auto Sales was found in Jones's wallet at the time of the accident. Jones had not requested that the S–15 pickup identified in the sales agreement between Bill Adams Auto Sales and Dale Jones be insured under his Progressive policy.

{¶ 16} At trial, Adams testified that he and Jones did not generally exchange money for the services that Jones rendered and for the amounts that Jones owed him, such as for rent, parts, and vehicles purchased. Rather, the two men kept a "running account" of what was owed, and they settled up on occasion at Jones's request. Adams indicated that he always owed money to Jones. He further stated that he had used a security agreement for the purchase of the S–10 because that had been the first vehicle that he had sold Jones, but that he did not require a security agreement for subsequent sales to Jones.

---

2. According to the index to the stipulated joint exhibits, Exhibit D represented the Used Vehicle Order form, dated March 8, 1999, for the Suburban, whereas Exhibit E represented the Used Vehicle Order form, dated March 20, 1998, for the Chevy S–10. Exhibit E, however, states that the vehicle model is "K20", not "S10." Upon review of those exhibits, we find it clear that both forms refer to the same vehicle, the Suburban. The VIN for the vehicles is the same on both forms and, upon reviewing the Progressive policy declarations page (Exhibit J), we see that K20 refers to a Suburban. It is undisputed, however, that Jones bought an S–10 truck and a Suburban from Adams.

{¶ 17} Addressing the purchase of the S–15 pickup, Adams testified that Jones had decided to buy the truck when the motor "blew" on his S–10. Adams completed the Used Vehicle Order form for the S–15, as he would with any vehicle that he sold. He testified that payment for the vehicle was probably taken off the running tab, per their typical arrangement. Adams testified that Jones had the only keys to the S–15 and that he considered the pickup to belong to Jones after the agreement was signed. Adams did not authorize Jones to use dealer license plates on the S–15 after that point, and he was not aware that they were being used. To the contrary, Adams testified that he had observed Jones put the license plates for his S–10 onto the S–15. Adams admitted that he held the title to the truck at the time of the accident, but that Jones had stated that he was considering giving the truck to this son. Adams testified that he also had not transferred title on the date of purchase when Jones purchased the Suburban. Adams denied that he loaned vehicles. Addressing Kelly Jones's assertion that she had borrowed a vehicle from him, Adams testified that Jones had arranged for Kelly to purchase a vehicle but that she had returned the vehicle the next day when Jones discovered that her prior car could be repaired.

{¶ 18} In contrast, Kelly Jones, Jones's daughter, testified that her father had stated that the S–15 pickup was being loaned to him while his S–10 pickup was being repaired. Kelly found parts to repair the S–10 after Jones's death. Kelly indicated that she had asked to borrow the S–15 sometime in May or June, but that her father had not allowed it because the truck belonged to Adams. She further testified that she had borrowed a 1999 Chevrolet Baretta from Bill Adams Auto Sales in August 2000, and that she was required to execute a Used Vehicle Order form for that vehicle. Kelly testified that she had had the Baretta for a few days and returned the vehicle to Bill Adams Auto Sales. Kelly denied that she had purchased the Baretta.

{¶ 19} Upon review of the Used Vehicle Order form for the S–15 pickup, Kelly testified that she did believe that the signature on the bottom looked like her father's signature. She stated that she was not aware of any payments that he made for the truck and that the truck had dealer license plates on it at the time of the accident. She testified that the S–10 and the Suburban did not have dealer tags.

{¶ 20} In its June 14, 2005 judgment, the trial court credited the testimony provided by Adams. The court found his testimony "very telling as to the relationship between Mr. Jones and Mr. Adams" and concluded that the two men were friends. The court credited Adams's testimony as to the course of dealing between Jones and him, and concluded that Jones had purchased the S–15 from Adams in their customary manner.

{¶ 21} Upon review of the record, we find ample support for that conclusion. Although the trial court could have credited Kelly's testimony that Bill Adams loaned vehicles and that her father had merely borrowed the S–15 pickup (and the two Used Vehicle Order forms for the Suburban lend some credence to that assertion), we cannot conclude that the court lost its way when it chose to believe Adams and found otherwise. Moreover, although the transaction apparently was not conducted in accordance with all of the statutory requirements, the court could have reasonably concluded that a sale occurred despite those irregularities. Considering the evidence that Adams and Jones kept a running account and that there had not been a security agreement on the Suburban, it was reasonable for the trial court to conclude that the S–15 pickup had been purchased in this manner as well. In sum, although the court could have reasonably concluded that a sale did not occur, the trial court's conclusion that Jones purchased the S–15 pickup from Adams was not against the manifest weight of the evidence.

{¶ 22} The sixth assignment of error is overruled.

{¶ 23} I. "The trial court improperly applied the Uniform Commercial Code rather than the Ohio Certificate of Title Act to determine competing ownership claims regarding the 1987 GMC S–15 truck."

{¶ 24} In her first assignment of error, Iker claims that the trial court should have used the Ohio Certificate of Motor Vehicle Title Act, R.C. Chapter 4505, to determine the ownership of the truck driven by Jones. In determining whether Jones was the owner of the vehicle for purposes of insurance coverage, the trial court applied the UCC, R.C. Chapter 1302.

{¶ 25} We will begin our analysis with the Ohio Certificate of Motor Vehicle Title Act. Pursuant to R.C. 4505.04(B), no court "shall recognize the right, title, claim, or interest of any person in or to any motor vehicle sold or disposed of, or mortgaged or encumbered" unless evidenced by a certificate of title, by admission in the pleadings, by stipulation of the parties, or by an instrument showing a valid security interest.

{¶ 26} The Supreme Court has stated that R.C. 4505.04 applies where parties assert competing rights or competing interests in a motor vehicle. See, e.g., *State v. Rhodes* (1982), 2 Ohio St.3d 74, 75, 2 OBR 629, 442 N.E.2d 1299. "R.C. 4505.04 was intended to apply to litigation where the parties were rival claimants to title, i.e., ownership of the automobile; to contests between the alleged owner and lien claimants; to litigation between the owner holding the valid certificate of title and one holding a stolen, forged or otherwise invalidly issued certificate of title; and to similar situations." *Hughes v. Al Green, Inc.* (1981), 65 Ohio St.2d 110, 115–116, 19 O.O.3d 307, 418 N.E.2d 1355, quoting *Grogan Chrysler–Plymouth, Inc. v. Gottfried* (1978), 59 Ohio App.2d 91, 94, 13 O.O.3d 154, 392 N.E.2d 1283.

{¶ 27} Over time, the Supreme Court has carved out several exceptions to the applicability of R.C. 4505.04. See, e.g., *State v. Shimits* (1984), 10 Ohio St.3d 83, 10 OBR 413, 461 N.E.2d 1278 (forfeiture case); *Hughes*, supra (risk of loss). In *Hughes*, the Supreme Court held that R.C. 4505.04 does not apply to the issue of risk of loss and that such cases were governed by the UCC. In *Smith v. Nationwide Mut. Ins. Co.* (1988), 37 Ohio St.3d 150, 524 N.E.2d 507, the court held that the criteria in R.C. 1302.42(B), not R.C. 4505.04, must be used to identify the owner of a vehicle for purposes of determining insurance coverage in case of an accident. In that case, the original owner, Frances, gave the vehicle to her son, Charles, who purchased insurance for the vehicle. The vehicle, however, remained titled in Frances's name. Charles then sold the vehicle to Smith. Although Smith was given the title after the sale, Frances's signature had not been notarized as required by R.C. 4505.07. Smith was subsequently injured in an accident and sued Charles's insurer, claiming that the underinsured motorist provision in Charles's policy covered his damages. Applying the Certificate of Title Act, the trial court and the court of appeals both held that Frances's assignment of title was invalid and that Smith was entitled to summary judgment.

{¶ 28} Following *Hughes*, the Supreme Court reversed, stating:

{¶ 29} "Although Hughes involved another U.C.C. section, we hold that the thesis underlying that decision is applicable here. Indeed, it is apparent that R.C. 4505.04 is irrelevant to all issues of ownership except those regarding the importation of vehicles, rights as between lienholders, rights of bona-fide purchasers, and instruments evidencing title and ownership. Otherwise, motor vehicle ownership rights will be determined by the Uniform Commercial Code. After the owner is identified, claims to insurance benefits attach to the owner's insurer. Thus, we hold that the criteria found in R.C. 1302.42(B), and not the Certificate of Title Act, identify the owner of a motor vehicle for purposes of determining insurance coverage in case of an accident. In this case, Roger Smith was clearly the owner of the motor vehicle under the U.C.C. test. Therefore, the Smiths have no claim for benefits under [Charles's] policy."

{¶ 30} As noted by Iker, since *Smith*, the Supreme Court has held that a proper transfer of title to the purchaser is required in order for the purchaser to obtain a recognizable interest in the automobile. *Saturn of Kings Automall, Inc. v. Mike Albert Leasing, Inc.* (2001), 92 Ohio St.3d 513, 518, 751 N.E.2d 1019. In *Saturn*, two dealers held title to automobiles that were sold to Gallatin, another dealer. Gallatin was permitted to obtain possession of the vehicles prior to paying for the vehicles, but the dealers retained the titles to the vehicles pending receipt of payment. Gallatin subsequently sold the vehicles to Albert Leasing, Inc. and received payment for them. However, Gallatin failed to remit payment

to the two dealers. Consequently, the dealers sought replevin of the vehicles and damages.

{¶ 31} On appeal to the Supreme Court, the parties disputed whether the action was governed by R.C. 4505.04 or the UCC, particularly R.C. 1302.44, which addresses entrustment. The court concluded that "[i]n determining competing claims of ownership of a motor vehicle, R.C. 4505.04(A) controls over the provisions of the Uniform Commercial Code." Id. at syllabus. Applying that statute to the facts, the court ruled that because the dealerships had retained the certificates of title and they had never been assigned to Gallatin, Gallatin had never been the lawful owner of the vehicles. Thus, Gallatin could not pass title to the purchasers.

{¶ 32} Recently, the Supreme Court of Ohio again applied the Certificate of Motor Vehicle Title Act, rather than the UCC, to determine ownership when there were conflicting claims to the vehicle. The Supreme Court held that "[w]hen an individual acquires a motor vehicle using a counterfeit check and sells the vehicle to a purchaser, R.C. 4505.04 determines who possesses valid title to the motor vehicle." *Allan Nott Ents., Inc. v. Nicholas Starr Auto, L.L.C.,* 110 Ohio St.3d 112, 2006-Ohio-3819, 851 N.E.2d 479.

{¶ 33} In our view, the Supreme Court's recent opinions in *Saturn* and *Allan Nott* do not alter the continued vitality of *Smith.* Neither *Saturn* nor *Allan Nott* concerned risk of loss or insurance coverage, and neither overruled *Smith.* To the contrary, in *Saturn,* the Supreme Court expressly distinguished its factual circumstances from *Hughes* and *Smith,* stating:

{¶ 34} "The issues presented in *Hughes* and *Smith* were not the same as the issue before the court in this matter. In *Hughes* and in *Smith,* the court was asked to decide whether the Ohio Certificate of Title Act or the Ohio UCC controlled in order to identify the owners of motor vehicles for purposes of determining which party was responsible for the risk of loss (*Hughes*) and insurance coverage (*Smith*) for damages that occurred to a motor vehicle prior to the lawful transfer of title.

{¶ 35} "We are once again called upon to decide, upon the facts before us, whether Ohio's Certificate of Motor Vehicle Title Law or Ohio's UCC applies. In *Hughes* and in *Smith,* however, it bears repeating that the issues were risk of loss and insurance coverage. Conversely, the question now before us involves competing claims of ownership of three motor vehicles. Here, contractual rights between the parties are not at issue." *Saturn,* 92 Ohio St.3d at 518, 751 N.E.2d 1019.

{¶ 36} In the present case, we agree with the trial court that the UCC provided the proper means to determine Auto–Owners' and Progressive's coverage obli-

gations. Although Iker claims that this action involves competing claims of ownership, this action does not involve rival claimants to title or other similar situations. Rather, as in *Smith*, the trial court was asked to identify the owner of a vehicle for purposes of determining insurance coverage when an accident occurred. Accordingly, pursuant to *Smith*, R.C. 1302.42 applied.

{¶ 37} The first assignment of error is overruled.

{¶ 38} II. "The trial court incorrectly applied Ohio Revised Code Provision Section 1302.42(B) when it should have applied Ohio Revised Code Provision Section 1302.42(C)."

{¶ 39} III. "The trial court mis-applied Ohio Revised Code Provision Section 1302.42(B)."

{¶ 40} In her second and third assignments of error, Iker claims that the trial court incorrectly employed R.C. 1302.42(B) rather than R.C. 1302.42(C). Iker argues, in the alternative, that the court misapplied R.C. 1302.42(B) even if it controls.

{¶ 41} R.C. 1302.42 states:

{¶ 42} "(B) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place * * *.

{¶ 43} "(C) Unless otherwise explicitly agreed where delivery is to be made without moving the goods:

{¶ 44} "(1) If the seller is to deliver a document of title, title passes at the time when and the place where the seller delivers the documents.

{¶ 45} "(2) If the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting."

{¶ 46} In support of her assertion that the trial court should have applied R.C. 1302.42(C), Iker relies upon *Grange Mut. Cas. Co. v. Smith* (1992), 80 Ohio App.3d 426, 609 N.E.2d 585. In *Grange*, Smith sold a Chevrolet Impala to his stepdaughter, Palmer, who had been using the vehicle and had possession of it. Before Smith transferred the title to Palmer, Palmer's fiancé was involved in an accident while driving the car. The trial court concluded that, because Palmer already had possession of the car, R.C. 1302.42(C) applied to the transaction. The court thus concluded that because Smith had the title, Smith still owned the vehicle on the date of the accident. Relying upon the Official Comments to UCC 2–401, the Fourth District Court of Appeals affirmed the use of R.C. 1302.42(C). The appellate court also concluded that although the Supreme Court's opinion in

*Smith* had applied R.C. 1302.42(B), the court was not precluded from applying R.C. 1302.42(C). The Fourth District noted that the Supreme Court had applied R.C. 1302.42(B) because it was the relevant section of the UCC for those factual circumstances. The court of appeals thus concluded that because the stepdaughter had possession of the Impala at the time of the contract for sale, the trial court did not err in determining that R.C. 1302.42(C) applied.

{¶ 47} We find *Grange* to be inapposite to the present circumstances. Here, the parties stipulated that Jones executed a written sales agreement with Bill Adams Auto Sales for the GMC S–15 pickup on May 11, 2000, which the trial court concluded indicated a sale. The parties further stipulated that Jones took possession of the S–15 immediately after executing the sales agreement. Adams testified that Jones had the only keys to the vehicle and that he considered the truck to belong to Jones after the sales agreement was signed. Based on the evidence, the contract contemplated a physical delivery of the truck from Adams to Jones, which in fact occurred immediately after executing the written contract. Unlike the stepdaughter in *Grange,* Jones was not in possession of the pickup prior to the contract. Accordingly, the trial court properly applied R.C. 1302.42(B) rather than R.C. 1302.42(C). See, also, *Wilson v. Brooks* (June 28, 1999), Butler App. Nos. CA98–06–123, CA98–06–132, 1999 WL 459571.

{¶ 48} As an alternative argument, Iker asserts that the trial court misapplied R.C. 1302.42(B) by failing to consider the language of the Used Vehicle Order form. In particular, she cites paragraph 2A of the preprinted conditions on the back of the form, which states: "We the dealer will deliver to the purchaser the title to the purchased used vehicle free and clear of all liens and encumbrances upon full payment of the purchase price." Iker argues that this paragraph constitutes an "explicit agreement" that title would pass to Jones upon payment in full and not before.

{¶ 49} We find nothing ambiguous in the language of paragraph 2A. In light of the fact that paragraph 2A refers to the "delivery" of "the title," paragraph 2A is more properly construed as referring to the delivery of a document of title rather than of the ownership interest. In our view, paragraph 2A does not constitute an agreement that affected when title, in the sense of ownership, passed to the buyer under R.C. 1302.42(B).

{¶ 50} The second and third assignments of error are overruled.

{¶ 51} IV. "The trial court erred when it overruled the appellant's objections to hearsay testimony."

{¶ 52} In her fourth assignment of error, Iker argues that the trial court erroneously overruled objections to hearsay statements from Jones. In response, Progressive argues that Iker failed to identify where in the transcript such errors

occurred, as required by App.R. 16(A), and that her assignment of error should be disregarded. Auto–Owners and Progressive further assert that any error by the trial court was harmless, because the court's ruling was based on other competent, credible evidence. In her reply brief, Iker provides citations to the transcript for nine occurrences where statements by Jones were admitted over objection. While we agree with Progressive that Iker's brief failed to cite the record in accordance with App.R. 16, we have chosen, in our discretion, to address the merits of her argument based on the citations that she belatedly provided.

{¶ 53} In her reply brief, Iker cites several instances in which Adams testified to alleged statements by Jones related to Jones's intentions to purchase the S–15 pickup from him and the arrangements for that purchase, including why title was not immediately transferred, whether Jones had purchased insurance for the S–15, and whether he had arranged for license plates for the S–15. Adams's testimony that Jones approached him about purchasing the vehicle, his description of the arrangements for payment, and his recollection that he saw Jones put license plates from the red S–10 on the S–15 are descriptions of Adams's observations of Jones's actions, not statements by Jones. Accordingly, that testimony does not constitute hearsay. Adams's testimony that Jones told him he had not decided what to do with the S–15 and that he was considering giving the truck to his son were not offered for the truth of Jones's intentions for the S–15 truck; rather, they were offered to explain the reasons that Adams did not transfer title to Jones immediately after he signed the sales agreement. Accordingly, those statements are also not inadmissible hearsay. Finally, Adams testified that Jones stated that he had put the S–15 truck on his insurance policy. Although this statement constitutes hearsay, we find it to be harmless. The parties stipulated that Jones did not request that the S–15 truck be placed on his insurance with Progressive, and there was substantial additional evidence from which the trial court could conclude that Jones purchased the S–15 pickup from Adams.

{¶ 54} The fourth assignment of error is overruled.

{¶ 55} V. "Auto Owners and Progressive should not benefit from their insured's unclean hands."

{¶ 56} In her fifth assignment of error, Iker claims that Adams and Jones violated several provisions of R.C. Title 45 during the alleged sale of the truck to Jones. Iker contends that as a result of these violations, Adams and Jones should be denied the benefits of a declaratory judgment under the doctrine of unclean hands.

{¶ 57} Although Iker focuses on Adams's and Jones's conduct, Adams had been dismissed from the litigation and is not a party to the declaratory judgment action. Moreover, the parties have stipulated that Iker would not seek to satisfy a judgment against Jones's estate and Adams. Accordingly, Adams and the estate were not affected—either positively or negatively—by the court's judgment.

{¶ 58} Moreover, we emphasize that the parties involved in the trial sought a declaratory judgment as to the responsibilities of the insurance companies with whom Adams and Jones had policies. Iker provides no authority for imputing the alleged misconduct of Adams and Jones to the insurance companies, and we are aware of none. To the contrary, violations of R.C. Title 45 are generally irrelevant to the determination of ownership for purposes of insurance. See *Smith* and *Wilson*, supra. We find no basis to conclude that Auto–Owners and Progressive should be precluded from a judgment in their favor under the doctrine of unclean hands.

{¶ 59} The fifth assignment of error is overruled.

{¶ 60} Having overruled all of the assignments of error, the judgment of the trial court will be affirmed.

Judgment affirmed.

DONOVAN and WALTERS, JJ., concur.

SUMNER E. WALTERS, J., retired of the Third District Court of Appeals, sitting by assignment.