[Cite as *Wolf v. Rothstein*, 2016-Ohio-5441.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

JUDAH WOLF, et al. :
:
*Plaintiffs-Appellants* : Appellate Case No. 26859
:
v. : Trial Court Case No. 2010-CV-3165
:
LAWRENCE B. ROTHSTEIN, M.D., et : (Civil Appeal from
al. : Common Pleas Court)
:
*Defendants-Appellees* :

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of August, 2016.

. . . . . . . . . . .

GARY J. LEPPLA, Atty. Reg. No. 0017172, PHILIP J. LEPPLA, Atty. Reg. No. 0089075, 2100 South Patterson Boulevard, Dayton, Ohio 45409
        Attorneys for Plaintiffs-Appellants

DAVID LOCKEMEYER, Atty. Reg. No. 0059188, JOSHUA DEBRA, Atty. Reg. No. 0083267, 6281 Tri-Ridge Boulevard, Suite 210, Loveland, Ohio 45150
        Attorneys for Defendant-Appellee-Riverview Health Institute

ROBERT SNYDER, Atty. Reg. No. 0030556, SUSAN BLASIK-MILLER, Atty. Reg. No. 0005248, One South Main Street, Suite 1800, Dayton, Ohio 45402
        Attorneys for Defendant-Appellee-North American Laserscopic Spine Institute

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This case is before the court on the appeal of Plaintiffs-Appellants, Judah Wolf and Malka Wolf, from a jury verdict in favor of Defendants-Appellees, Riverview Health Institute, LLC ("Riverview") and North American Laserscopic Spine Institute ("NALSI").[1]  In support of their appeal, the Wolfs contend that the trial court erred in submitting 39 written jury interrogatories and by revising the instructions for the interrogatories, which caused jury confusion and prevented a fair trial.  In addition, the Wolfs contend that Riverview prejudicially displayed a medical device that was not in evidence during closing argument, and that NALSI improperly displayed jury interrogatories to the jury during closing argument.

{¶ 2} The Wolfs further contend that the trial court erred in refusing to allow them to examine defense witnesses about medical board action taken against the doctor who performed the medical procedure that is the subject of this medical malpractice action, in limiting cross-examination about the relationship between that doctor and Appellees, and in allowing defense counsel to improperly lead the testimony of expert witnesses. Finally, the Wolfs contend that, for all the above reasons, the trial court erred in failing to grant their motions for a new trial and for relief from judgment.

{¶ 3} We conclude that no prejudicial error occurred in the trial court.  The trial court did not err in submitting interrogatories to the jury and in constructing a "roadmap" for the jury.   Instead, the court's efforts aided the jury in resolving the case.   In addition, the court did not err in refusing to allow Appellants to examine witnesses about a doctor's

---

[1]  For purposes of convenience, we will refer to Appellants collectively as the "Wolfs," and individually by their first names.

alleged prior medical malpractice and proceedings before the Ohio State Medical Board. This evidence was both irrelevant and unduly prejudicial.

{¶ 4} Furthermore, the trial court did not abuse its discretion in limiting evidence about the relationships between Appellees, and in permitting Appellees to ask some leading questions. Finally, even though Appellees' counsel committed misconduct in displaying an object to the jury that had not been admitted into evidence, no material prejudice occurred. Accordingly, for the reasons stated below, the judgment of the trial court will be affirmed.

## I.  Facts and Course of Proceedings

{¶ 5} At the outset, we note that the Wolfs failed to submit a complete transcript of the trial proceedings. Instead, they submitted a partial transcript, which includes only the following items: (1) the testimony of defense expert, Erich Richter, M.D.; (2) the testimony of defense expert, Robert Biscup, M.D.; (3) the testimony of Ethan Fallang, C.E.O. of Riverview; (4) the closing arguments of the parties; and (5) parts of the proceedings on April 28, 2014, April 30, 2014, and May 1, 2014, relating to the jury instructions and the verdict.

{¶ 6} An appellant's duty to provide a transcript for appellate review is well-established. *See, e.g., Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199, 400 N.E.2d 384 (1980). "This is necessarily so because an appellant bears the burden of showing error by reference." (Citation omitted.) *Id.*

{¶ 7} For purposes of background information only, we note that the Wolfs filed a medical malpractice complaint in April 2010 against Dr. Lawrence Rothstein, NALSI,

Riverview, and various John and Jane Does. The Wolfs alleged in the complaint that, as the result of persistent neck pain, Judah began investigating treatment options in mid-2008. The Wolfs were Florida residents. Judah's search included the internet, where he discovered Defendants, who held themselves out as providing care for persons with spine injuries.

{¶ 8} After contacting Defendants, Judah provided an MRI report of July 14, 2008 regarding his cervical pain and symptoms, and cervical laserscopic surgery was scheduled in Dayton, Ohio, for January 29, 2009. When Judah arrived in Dayton on January 26, 2009, he discussed back problems, and an additional procedure (for enduroscopic laser lumbar spine surgery) was scheduled for January 28, 2009.

{¶ 9} Judah alleged in the complaint that he developed symptoms after the back surgery, including weakness in both legs, loss of muscle tone, hip pain, inability to control and walk properly with his right foot, numbness, and foot drop. Dr. Rothstein performed a second lumbar procedure on April 7, 2009, but indicated that he might not be able to fix the foot drop. Subsequently, Judah underwent further surgeries in Florida in an attempt to address his problems.

{¶ 10} In the complaint, the Wolfs alleged that Dr. Rothstein had breached the appropriate standard of care, which resulted in permanent injury, including foot drop. They further alleged that Judah was not properly informed of the risks of the surgery, and that the surgery was performed in the absence of diagnostic testing and in reliance on an outdated MRI report. In addition, the Wolfs alleged that the surgery performed on January 28, 2009, was neither appropriate nor necessary. The complaint also contained a fraud claim, based on Defendants' failure to properly investigate and diagnose, and

based on the performance of surgery, itself. A loss of consortium claim was also included, for Malka.

{¶ 11} The case was stayed in June 2010, due to Dr. Rothstein's bankruptcy, but was reactivated in February 2011. In August 2012, a motion to consolidate this case with other pending cases against Dr. Rothstein was denied. Subsequently, in December 2013, NALSI filed a motion for summary judgment, based on its contention that no agency relationship existed between NALSI and Dr. Rothstein, nor was there any basis for agency by estoppel. In January 2014, Riverview also filed a motion for summary judgment, based on the same grounds. However, the trial court denied the motions for summary judgment on April 2, 2014.

{¶ 12} Prior to trial, the parties also filed memoranda regarding the admission of testimony regarding other medical malpractice cases brought against the Defendants, including Dr. Rothstein, and any reference to prior or subsequent Ohio State Medical Board proceedings against Dr. Rothstein.[2] No entry discussing these matters appears in the record, but the trial court did not permit this evidence at trial.

{¶ 13} A jury was empaneled on April 17, 2014, and the case was then tried to the jury, which found in favor of Rothstein, Riverview, and NALSI, and against the Wolfs, on May 1, 2014. After the verdict forms and interrogatories were filed, the Wolfs filed motions for new trial and for relief from judgment on May 15, 2014. The trial judge did not rule on these motions before leaving office, and in May 2015, another judge was

---

[2] In April 2013, Dr. Rothstein surrendered his medical license to practice medicine in Ohio, after a complaint had been filed by the State Medical Board. The complaint regarded Rothstein's alleged inappropriate use of laser endoscopic technique, performance of procedures that were clinically contraindicated, and/or failure to provide appropriate follow-up care in cases involving 12 patients between 2002 and April 2009.

assigned to preside over the case and conclude proceedings. Because judgment had never been properly entered, the assigned judge filed a judgment entry granting judgment to Defendants on June 3, 2015. The Wolfs then renewed their motions for new trial and for relief from judgment.

**{¶ 14}** On September 9, 2015, after reviewing the digital video recording of the entire trial, the assigned judge denied the motions for new trial and for relief from judgment. The Wolfs now appeal from the judgment in favor of Defendants-Appellees.

## II.   Alleged Error in Allowing Submission of Interrogatories

**{¶ 15}** The Wolfs' First Assignment of Error states that:

The Trial Court Erred, as a Matter of Law, When It Permitted the Submission of 39 Written Jury Interrogatories, over Objection by Plaintiffs/Appellants, Including Indecipherable and Repeatedly Revised Instructions Causing Confusion for the Jury and Preempting a Fair Trial.

**{¶ 16}** Under this assignment of error, the Wolfs contend that irregularities in the interrogatories, and the number and form of the interrogatories, resulted in confusion that deprived them of a fair trial. In contrast, NALSI and Riverview argue that the interrogatories, themselves, were not confusing or legally objectionable, and that the trial court acted properly in providing the jury with a "roadmap" for answering the interrogatories.

**{¶ 17}** Civ.R. 49(B) provides that:

The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to

the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

{¶ 18} " 'The purpose of an interrogatory is to "test the jury's thinking in resolving an ultimate issue so as not to conflict with its verdict." ' " *Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, ¶ 79, quoting *Freeman v. Norfolk & W. Ry. Co.*, 69 Ohio St.3d 611, 613, 635 N.E.2d 310 (1994). The Supreme Court of Ohio has held that the requirement of submitting interrogatories upon request "is mandatory, but the further requirement of the rule that 'the interrogatories shall be submitted to the jury in the form that the court approves' reposes discretion in the trial court to review and approve the appropriateness and content of proposed interrogatories." *Ragone v. Vitali & Beltrami, Jr., Inc.*, 42 Ohio St.2d 161, 327 N.E.2d 645 (1975), paragraph one of the syllabus. This discretion is limited, and is confined to rejecting "submission of the interrogatories where the request is untimely or the proposed interrogatories are ambiguous, confusing, redundant, or otherwise legally objectionable." *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 107, 592 N.E.2d 828 (1992).

{¶ 19} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted.) *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597

(1990). In *AAAA Enterprises*, the court stressed that "[i]t is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." The court further stated that:

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.

*Id.*

{¶ 20} Consistent with Civ.R. 49(B), the parties submitted proposed interrogatories prior to closing argument. The Wolfs submitted a total of 16 interrogatories; NALSI submitted 36 interrogatories; and Riverview submitted 12 interrogatories. Some of these appear duplicative, and the court eventually submitted 39 interrogatories to the jury.

{¶ 21} The transcript submitted to our court does not cover any initial discussion of the interrogatories or jury instructions. Apparently, presentation of evidence ended on Friday, April 25, 2014 (or sometime before that, as the transcript is not before us). Closing arguments were scheduled for Monday, April 28. On Friday morning, NALSI submitted 19 interrogatories in addition to the 17 it had already proposed, and on Sunday evening, the Wolfs filed 6 instructions in addition to the 10 they had already requested.

{¶ 22} On Monday morning, the parties and the court discussed alterations to the interrogatories and their order. *See* Excerpt of Proceedings beginning on April 28, 2014, at 9:10 a.m., pp. 9-23. At that time, the Wolfs did not object to the interrogatories, nor

did they contend the interrogatories were confusing.[3]

{¶ 23} Closing arguments began at about 10:43 a.m. on April 28, 2014, and ended at about 1:46 p.m. *See* Transcript of Proceedings (Closing Arguments Only), pp. 3-100. The court then worked until 3:48 p.m. that day on finalizing the jury instructions. *See* Excerpt Transcript of Proceedings beginning on April 28, 2014, at 10:33 a.m., and recommencing on April 28, 2014, at 3:48 p.m., pp. 5-7.[4] The court then read the instructions to the jury, from about 3:48 to 5:43 p.m. *Id.* at pp. 7-66 and 71-72. After the instructions were read, the parties entered objections to the instructions. At that time, the Wolfs renewed their prior objections (which, as was noted, are not in the record). *Id.* at p. 67. The Wolfs also argued that there were too many interrogatories and that the instructions at the bottom of the interrogatories led the jury to confusing locations. *Id.* at p. 68. Additionally, the other parties made various objections to the instructions and interrogatories. *Id.* at pp. 68-71. In response, the court expressed frustration over the many last-minute changes, which caused delay in submitting the case to the jury. *Id.* at pp. 71-72.

{¶ 24} The record does not reflect whether the jury deliberated on Monday night or on Tuesday, April 29. However, on Wednesday, April 30, 2014, the court held an in

---

[3] During this discussion, the Wolfs' counsel indicated that he would stand on his other objections, but the record does not indicate what those objections were, since that part of the proceedings was not transcribed. Excerpt of Proceedings beginning on April 28, 9:10 a.m., p. 17.

[4] It should be noted that the partial transcripts of the conferences about jury instructions and the closing arguments were presented in three separate volumes entitled "Excerpt of Proceedings," "Excerpt Transcript of Proceedings," and "Transcript of Proceedings (Closing Arguments only)." There was also no continuity in the transcripts, as segments of a particular day were found in more than one volume, making it very difficult to follow the proceedings.

chambers conference with the attorneys concerning a question the jury had asked about whether it should skip a particular interrogatory. *See* Excerpt of Proceedings beginning on April 28, 2014, at 9:10 a.m., and recommencing on April 30, 2014, at 10:29 a.m., p. 29, and Court's Ex. II. The court and parties agreed that the jury should be told to answer Interrogatories 22 and 29 and follow their instructions. *Id.* at pp. 30-31.

{¶ 25} About an hour later, the jury had another question. *See* Excerpt Transcript of Proceedings beginning on April 28, 2014, at 10:33 a.m., and recommencing on April 30, 2014, at 11:27 a.m., p. 73, and Court's Ex. III. At that time, the jury had the following question:

> Interrogatory 29 says, "If your answer to interrogatory 29 is no and your answer to interrogatory 20 was yes, please proceed to interrogatory 36." We were never instructed to answer number five. One, do we need to go back to number five; or two, can we go straight to number 36; or three, is there anything else we need to do?

*Id.* at p. 74.

{¶ 26} After a discussion with the parties, the court indicated that it was thinking about telling the jury to go straight to interrogatory 36, but would call the parties if the court had further thoughts. *Id.* at p. 80. However, at 3:17 p.m. that day, the court held another conference with the parties, and indicated that it had not answered Court's Ex. III. *See* Excerpt of Proceedings beginning on April 28, 2014, at 9:10 a.m., and recommencing on April 30, 2014, at 3:17 p.m., p. 31. Instead, the court and its staff attorney had gone through the interrogatories and had made a "roadmap" for the jury. *Id.* at p. 32. However, the court was not quite finished, and gave the roadmap to the

parties for review. *Id.* At that time, the Wolfs moved for a mistrial, contending that the jury was lost and that the roadmap would lead to further confusion. *Id.* at p. 33.

{¶ 27} The court did not rule on the motion for mistrial, but continued to work on the roadmap. At 4:27 p.m., the court had finished, and convened another conference with the parties. Excerpt of Proceedings, beginning on April 28, 2014, at 9:10 a.m., and recommencing on April 30, 2014, at 4:27 p.m., p. 33. The court indicated that it had overruled the motion for mistrial, and that the roadmap was designed to eliminate confusion. *Id.* The court further stated that "We will also stress to them [the jury] that if there is any issue that they have or confusion, that they would have as a result of this, we will be ready to answer questions." *Id.*

{¶ 28} Following these comments, the court read the roadmap to the jury. *Id.* at pp. 35-57. After another conference with the attorneys, in which a few additional corrections were made, the court sent the final roadmap to the jury. *Id.* at pp. 57-65, and Court's Ex. V. The roadmap instructed the jury that it must complete Interrogatories #s 1, 2, 3, 11, 22, and 29. *Id.* at Ex. V. The roadmap also contained detailed instructions for the jury with respect to how the interrogatories should be completed. *Id.*

{¶ 29} The record does not indicate how long the jury deliberated on April 30, 2014, after it received the instructions. However, just shortly before noon on Thursday, May 1, 2014, the jury completed its deliberations and rendered a verdict. *See* Excerpt Transcript of Proceedings beginning on April 28, 2014, and recommencing on May 1, 2014, at 11:33 a.m., p. 81.

{¶ 30} The jury found as follows: #1 – Rothstein was not under the control of NALSI; #2 – that Riverview did not hold itself out to the public as a provider of medical

services, and Judah did not look to Riverview, rather than Rothstein, for competent medical care; #3 – that Rothstein did not depart from accepted standards of medical care in Judah's care and treatment; #11 – that Rothstein did not make a misrepresentation to Plaintiffs or conceal facts; #22 – that NALSI did not make a misrepresentation to Plaintiffs or conceal facts; and #29 – that Riverview did not make a misrepresentation to Plaintiffs or conceal facts. Court's Exs. XII, XIII, XIV, XV, XVI, and XVII.

{¶ 31} Consistent with the interrogatory answers, the jurors signed general verdict forms in favor of the Defendants and against Judah and Malka. *See* Court's Exs. VI, VII, VIII, IX, X, and XI.

{¶ 32} In view of the record, we cannot find that the trial court acted unreasonably in allowing a large number of jury instructions and in constructing a roadmap to aid the jury. The interrogatories themselves are not confusing, and when the jury appeared to be confused, the trial court responded appropriately.

{¶ 33} In support of their argument, the Wolfs cite *Wood v. Harborside Healthcare*, 197 Ohio App.3d 667, 2012-Ohio-156, 968 N.E.2d 568 (8th Dist.), in which the court of appeals reversed a defense verdict, noting that "[a]t worst, one could conclude that the jury felt compelled by the trial court to return a defense verdict. At best, the jury's inability to follow the judge's instructions, which were confusing, and provide proper and consistent responses to the interrogatories was an irregularity that deprived [plaintiff] of a fair trial and just verdict." *Id.* at ¶ 20. However, the situation in *Wood* was far different than what occurred in the case before us.

{¶ 34} In *Wood*, the jury returned a verdict for the plaintiff, but there was an inconsistency in the interrogatory answers. Initially, the jury returned a verdict for the

plaintiff, found specific acts of negligence by the defendant, and awarded $250,000 in damages. *Id.* at ¶ 10. Specifically, the jury concluded that the defendant's negligent acts resulted in damages for the plaintiff's death, but also concluded that the negligence was not the proximate cause of the plaintiff's injuries *and* death. (Emphasis sic.) *Id.* at ¶ 7 and 9. A separate interrogatory allowed an award for damages prior to death, and the jury skipped that interrogatory. *Id.* at ¶ 10. The first time the court returned the case to the jury after telling the jury that its interrogatory answers were inconsistent with the verdict, the jury returned another verdict for the plaintiff, but crossed out the amount it had written earlier. *Id.* at ¶ 11-12. The third time the case was returned to the jury, with an instruction that its verdict and interrogatory answers were inconsistent, the jury returned a verdict for the defendant. *Id.* at ¶ 13.

{¶ 35} On appeal, the court concluded that the trial court erred in denying a motion for new trial, due to the significant irregularities in the jury deliberations. *Id.* at ¶ 17-18. The court of appeals noted that the trial judge failed to fix an error in the interrogatories that he promised to correct before the case was sent to the jury, and the attorneys were unaware of it because the court did not read the interrogatories to the jury. *Id.* at ¶ 18.

{¶ 36} The court also observed that the jury was not likely confused by the erroneous instruction, but based on the jury's answers, one could infer that the jury did find for the plaintiff with respect to the defendant's negligence for death, but that the trial court, nevertheless sent the jury back twice until the jury finally returned with a defense verdict. *Id.* at ¶ 19-20. It is in this context that the court made the above comments about the jury feeling compelled to return a defense verdict. *Id.* at ¶ 20.

{¶ 37} Again, this is not the situation in the case before us. The interrogatory

answers were consistent with the verdict, and the trial court did not send the jury back after receiving an inconsistent verdict. The trial court, instead, simply attempted to clarify for the jury what route it should take in answering the interrogatories.

**{¶ 38}** As a final matter, we note that the Wolfs' motion for new trial was supported by the affidavit of their counsel. In the affidavit, counsel refers to a juror's statement after the verdict (to the effect that the jurors felt the interrogatories were unfair and "boxed in the plaintiff.") Doc. #263, Affidavit in Support of Motion for New Trial and Relief from Judgment, ¶ 2. The law is well-established that even in situations involving juror misconduct, an attorney's testimony about what he or she heard a juror say " 'is incompetent and may not be received for the purposes of impeaching the verdict.' " *Bd. of Trustees of Sinclair Community College Dist. v. Farra*, 2d Dist. Montgomery No. 22886, 2010-Ohio-568, ¶ 84, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 75-76, 564 N.E.2d 54 (1990). "The general rule is that a jury verdict cannot be impeached, changed or explained by any juror's statement, except where used in exceptional circumstances as a basis for showing improper conduct in arriving at the verdict." (Citations omitted.) *State v. Perry*, 2d Dist. Montgomery No. 11397, 1989 WL 65253, *4 (June 8, 1989).

**{¶ 39}** Accordingly, based on the preceding discussion, the First Assignment of Error is overruled.

### III. Alleged Errors in Closing Argument

**{¶ 40}** The Wolfs' Second Assignment of Error states that:

Defendants'/Appellees' Outrageous Display of an Alleged Medical Device, Which Was Not in Evidence, During Closing Argument, Was

Grossly Prejudicial and Unsupported in Defendants/Appellees' Expert Testimony.

{¶ 41} Under this assignment of error, the Wolfs contend that the trial court erred in failing to grant their motion for a mistrial and in failing to grant the motion for new trial, in light of the misconduct of Riverview's attorney during closing argument. The alleged misconduct relates to a pair of "graspers," that were not identified during trial and were not admitted into evidence.

{¶ 42} One of the issues at trial was whether Dr. Rothstein removed disc material or the extent of any removal during his surgeries. According to the defense experts (which are the only transcripts we have), disc herniation, disc fragments, disc inflammation, or facet hypertrophy can cause compression on the nerve roots in the spine. Traditionally, in open microdiscetomy a surgeon like Dr. Richter (a defense expert who is a neurosurgeon) pulls muscle from the bony surface underneath the nerves, This surface is called the pedicle. A hole is drilled underneath, and part of the facet is cut out. Over the years, surgeons have worked on ways of making smaller incisions.

{¶ 43} Dr. Rothstein (who was an anesthesiologist, not a surgeon), created a process that attempted to be minimally invasive, by inserting a small, steerable catheter through a hole in the base of the spine, at the sacral hiatus. In contrast to a traditional approach, in which bone is removed, Dr. Rothstein's process involved neural decompression by removing soft tissue.

{¶ 44} The catheter that was used has more than one port. A camera can be placed in one port and some kind of operating instrument can be inserted in the other. Dr. Richter indicated that little graspers can be inserted through the other port to pull out

disc fragments. A laser can also be inserted to shrink the fragments. Dr. Richter additionally mentioned heating elements that can be used to burn fragments. Excerpt Transcript of Proceedings (Testimony of Erich Richter, M.D., only), pp. 34-35.

{¶ 45} Dr. Rothstein's operative reports for January 28, 2009, and April 7, 2009, refer to the isolation and removal of protruding disc tissue through the use of "lavage, graspers, and cautery, freeing up the nerve roots." Plaintiff's Exs. 2A, p. 1, and 2(B), p. 1. Cautery can be done with either a laser or an ablating wire. Richter at p. 130-131.

{¶ 46} Dr. Biscup, another defense expert, also testified that the flexible catheter used in Rothstein's procedure had channels in which saline could be placed to wash out debris, and through which various instruments could be inserted. Dr. Biscup did indicate that graspers could be used to pull out disc fragments, but this would not be done through the catheter's scope; instead, a second incision, or second port, would be made. Excerpt Transcript of Proceedings (Testimony of Robert S. Biscup, M.D., only), pp. 26 and 51-52. Nothing in the operative reports indicated that a second incision was done. *Id.* at p. 53.

{¶ 47} In any event, no expert identified graspers, and no such instrument was admitted into evidence. During closing argument, Riverview's counsel displayed a grasper to the jury, and then began referring to its function. *See* Transcript of Proceedings (Closing Argument only), pp. 69-70. After the Wolfs' counsel objected, the trial court sustained the objection and told Riverview's counsel not to do that, since the matter was not in evidence. *Id.* at p. 70-71. The parties agree that counsel for the Wolfs stated during the sidebar that "This is mistrial stuff."

{¶ 48} Trial counsel are given great latitude in presenting closing argument to the jury. *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph two of the

syllabus. Furthermore, trial courts have discretion in deciding if counsel have exceeded the bounds of permissible argument, and the court's decision will not be reversed "absent an abuse of discretion." *Id.* at paragraph three of the syllabus. *Accord Lykins v. Miami Valley Hosp.*, 157 Ohio App.3d 291, 2004-Ohio-2732, 811 N.E.2d 124, ¶ 27 (2d Dist.)

**{¶ 49}** Unquestionably, counsel's reference to matters not in evidence was improper. Counsel would have been aware that the graspers he displayed had not been identified and were not in evidence. However, even when misconduct occurs, the issue is whether the conduct was so prejudicial as to deprive the opposing party of a fair trial. *See, e.g., State v. Willard*, 144 Ohio App.3d 767, 776, 761 N.E.2d 688 (10th Dist.2001).

**{¶ 50}** As was noted by the Wolfs, " '[a]ppellate courts ordinarily decline to reverse a trial court's judgment because of counsel's misconduct in argument unless (a) the argument injects non-record evidence or encourages irrational inferences, such as appeals to prejudice or juror self-interest or emotion, (b) the argument was likely to have a significant effect on jury deliberations, and (c) the trial court failed to sustain an objection or take other requested curative action when the argument was in process.' " *Peffer v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 94356, 2011-Ohio-450, ¶ 60, quoting *State v. Perry*, 8th Dist. Cuyahoga No. 84397, 2005–Ohio–27, ¶ 58. (Other citation omitted.)

**{¶ 51}** Applying these standards, the trial court did not abuse its discretion by failing to declare a mistrial, nor did the assigned trial judge err in failing to grant a motion for new trial on this basis. As was noted above, there was testimony from which a jury could conclude that "graspers" could be inserted in one of the ports of the catheter. Although counsel for Riverview improperly displayed such an object to the jury, we do not

believe it had a significant effect on the jury deliberations. Although whether tissue was removed was certainly an issue, the brief display of this object is unlikely to have had much effect. Furthermore, the trial court did sustain Plaintiffs' objection, and instructed Riverview's counsel not to show the object to the jury.

{¶ 52} Accordingly, the Second Assignment of Error is overruled.


IV. Error in Failing to Admit Evidence of Prior Bad Conduct

{¶ 53} The Wolfs' Third Assignment of Error states that:

The Trial Court Erred as a Matter of Law, When It Prevented Plaintiffs/Appellants from Using Evidence of Medical Board Action Against the Former Surgeon, and Evidence of Prior Similar Bad Conduct, to Rebut Evidence and Impeach Defendants/Appellees' Expert Witnesses.

{¶ 54} Under this assignment of error, the Wolfs contend that even if evidence of prior bad acts of Dr. Rothstein were not admissible to establish negligence, they should have been allowed to show that Riverview and NALSI had notice of Rothstein's substandard surgeries. The Wolfs further argue that the evidence was permissible for purposes of impeaching the testimony of defense experts, who had conversations with Rothstein outside trial regarding the technique he had developed, and who praised Rothstein as innovative, as having good judgment, and as being very experienced in doing the procedure.

{¶ 55} Prior to trial, Riverview and NALSI filed motions asking the court to exclude testimony regarding other alleged medical malpractice by Dr. Rothstein and 2012 proceedings at the Ohio State Medical Board regarding the revocation of Dr. Rothstein's

medical license. In this regard, they argued that the testimony was inadmissible because it was irrelevant, and to the extent relevant, was unduly prejudicial.

**{¶ 56}** The Wolfs' expert witness, Dr. Hambly, testified that the January 28, 2009 procedure performed on Judah was not indicated and was done without appropriate workup. He further concluded that at least a partial foot drop developed as a result of that procedure. In addition, Dr. Hambly stated that the procedures indicated in the post-operative notes of January 28, 2009 and April 7, 2009, were not done. April 3, 2014 Perpetuation Deposition of Dr. Hambly, pp. 19-20.

**{¶ 57}** Dr. Hambly was asked during his deposition about the instances listed in the complaint at the State Medical Board. When presented with a summary of the procedures listed in the complaint, Dr. Hambly stated that he saw similarity between those activities and the type of activities for which he had criticized Dr. Rothstein. *Id.* at pp. 61-62. When asked why, he stated that five of the twelve patients had foot drop post laser discectomy and that the complaints cite inadequate workup throughout. *Id.* at p. 62. When asked if these instances affected his opinion regarding Judah's surgery, Dr. Hambly stated that this "just sounds similar." *Id.* at p. 65. Dr. Hambly also said that even under the best of circumstances, with appropriate, qualified physicians, there is a risk of failure in the procedures performed on Judah. Dr. Hambly, himself, had a failure rate of about five to 10 percent. *Id.* at pp. 83-84.[5]

**{¶ 58}** Besides the medical proceedings, numerous medical malpractice cases had been filed against Dr. Rothstein in Montgomery County Common Pleas Court. As

---

[5] Dr. Hambly's testimony was not transcribed for the court of appeals, but his perpetuation deposition was filed with the trial court before trial. We have no idea what objections were sustained at trial, and we refer to his deposition for background information only.

was noted earlier, a motion to consolidate the Wolfs' case and other pending malpractice cases was denied in August 2012. In this regard, the court held that the cases all involved similar laserscopic surgery performed by Dr. Rothstein, but there was little commonality beyond this. Specifically, the court stated that "[e]ach plaintiff has a different presurgical history, different postsurgical outcomes, different post[-]surgical treatments, and different outcomes from such treatments." Doc. #85, Decision, Entry and Order Overruling the Motion for Consolidation, p. 2.

{¶ 59} In its liminal motion, Riverside pointed out that of the medical malpractice cases filed against Dr. Rothstein, only one had resulted in a jury verdict against Dr. Rothstein, and that case involved post-procedure anesthesia issues. Doc. #218, Defendant Riverview Health Institute's Bench Brief Regarding Permitting Discussion and Admission of Evidence of Prior Medical Malpractice Cases and Dr. Rothstein's 2012 Ohio Medical Board Case, p. 9. Of the 12 cases filed prior to 2009, one had resulted in a verdict (the anesthesia case), three had been settled, and eight had been dismissed. *Id.* Four cases were filed in 2009, after the care at issue in Judah's case, and there was apparently no resolution of those cases at the time of Riverview's memorandum. *Id.*

{¶ 60} At trial, after cross-examining Dr. Richter, the Wolfs indicated that they would have liked to further inquire about Rothstein's disciplinary record, based on the fact that Dr. Richter had communicated with Dr. Rothstein about the procedure Rothstein had invented, and had seen it performed. The trial court indicated it would not allow the testimony at that time, but would revisit the subject. Excerpt Transcript of Proceedings (Testimony of Erich Richter, M.D., only), pp. 141-142. The Wolfs did not make any proffer at the time. *Id.*

{¶ 61} Another defense expert, Dr. Biscup, had observed Dr. Rothstein perform a laser procedure in Dallas, Texas, and described the procedure as "new and innovative." Transcript of Proceedings (Testimony of Robert S. Biscup, M.D., only), p. 38. He further stated that Dr. Rothstein was "very experienced in doing it." *Id.* In addition, during cross-examination, Dr. Biscup stated that his opinions were based on Dr. Rothstein's "good experience and ability to perform what he says he's doing." *Id.* at p. 76.

{¶ 62} During Dr. Biscup's cross-examination, counsel for the Wolfs stated at sidebar that he believed an adequate foundation had been presented for examining Dr. Biscup about the findings of the state medical board. *Id.* at p. 104. At that time, the court indicated that perhaps counsel could ask a question. *Id.* at p. 107.

{¶ 63} However, counsel instead elected to simply ask Dr. Biscup if his opinions were grounded in his admiration for what Dr. Rothstein did when he observed Rothstein operate in Texas. *Id.* at pp. 107-109. Dr. Biscup responded affirmatively. The Wolfs' counsel then asked if Dr. Biscup received positive information from Dr. Rothstein when Dr. Biscup talked to Dr. Rothstein about his procedures and success rates. *Id.* at 110. Again, Dr. Biscup said yes. *Id.* As before, the Wolfs did not proffer any evidence. *Id.* Instead, counsel stated during the sidebar discussion that he would offer certified copies of the medical board proceedings as part of his exhibits. *Id.* at p. 107. This did not occur, at least in the record we have before us.

{¶ 64} The remaining testimony that was transcribed was the testimony of Ethan Fallang, who was the current C.E.O. of Riverview. During this examination, Fallang testified that Dr. Rothstein had a presence at Riverview from about 2005 until 2010, and that Riverview's website in late December 2008 listed Dr. Rothstein as a member of its

"team." Transcript of Proceedings (Testimony of Ethan Fallang only), pp. 7-9 and 23. The Wolfs did not, however, ask Fallang about medical complaints about Dr. Rothstein, or about Riverview's knowledge of any such complaints. At the end of Fallang's testimony, counsel for the Wolfs indicated that he would like to make a proffer, but the record does not contain any proffer. *Id.* at p. 36.

{¶ 65} In ruling on the motion for a new trial, the assigned judge rejected the Wolfs' arguments about admission of prior bad acts of Dr. Rothstein because they failed to proffer evidence that his frequencies of bad outcomes in similar surgeries exceeded the statistical norm. With respect to the admission of such evidence in connection with the fraud claims, the judge concluded, without finding error, that omission of this evidence regarding the fraud claim was harmless, since the jury found that Dr. Rothstein did not commit malpractice. In this regard, the court also stressed the jury's finding that Riverview did not hold itself out as the medical provider for Judah's surgery, and that NALSI did not control Dr. Rothstein. After considering the evidence submitted to us, we agree with the trial court.

{¶ 66} " 'A trial court has broad discretion in determining whether to admit or exclude evidence. Absent an abuse of discretion that materially prejudices a party, the trial court's decision will stand.' " *Lumpkin v. Wayne Hosp.*, 2d Dist. Darke No. 1615, 2004-Ohio-264, ¶ 12, quoting *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (1991).

{¶ 67} In *Lumpkin*, we rejected a plaintiff's attempt to show that the doctor she had sued for malpractice had made the "same surgical 'mistake' " on a patient a year earlier. *Id.* at ¶ 11. We observed that:

"Prior occurrences are sometimes relevant 'to show that a party knew or had notice of a dangerous condition.' '[I]n order for such occurrences to have been admissible to show prior knowledge on the part of [the defendant], these incidents must have occurred under circumstances substantially similar to those in [the plaintiff's] case.' The trial court has the discretion to determine whether the prior occurrences were substantially similar to the accident in question. Furthermore, the proponent of prior occurrence evidence has the burden of showing the substantial similarity of the circumstances."

*Lumpkin* at ¶ 13, quoting *Eakes v. K-Mart Intern. Headquarters, Inc.*, 2d Dist. Montgomery No. 17334, 1999 WL 252481, *3 (Apr. 30, 1999). (Internal citations omitted in original.)

{¶ 68} We concluded, however, that the plaintiff failed in her burden because she did not address the prior incident with the specificity that would allow a conclusion that the surgeries were "substantially similar." *Id.* at ¶ 15. The same is true in the case before us. As was noted, the record is devoid of details about the other malpractice cases that were filed in Montgomery County. Furthermore, although the medical complaints of the State Medical Board were mentioned during Dr. Hambly's deposition, his indication was only that five of the cases involved foot drop. This was not sufficient.

{¶ 69} Moreover, with respect to the complaint before the Ohio State Medical Board, we note that R.C. 4731.22(B) allows the board to revoke or suspend an individual's license to practice medicine for various infractions, including departure from "minimal standards of care of similar practitioners * * *." R.C. 4731.22(B)(6). Disciplinary actions are taken pursuant to an adjudication under R.C. Chap. 119. R.C. 4731.22(C).

In addition, R.C. 4731.22(F) provides for an investigation by the board of evidence showing violations by a doctor. In an appeal from an order of the medical board, "a reviewing trial court is bound to uphold the order if it is supported by reliable, probative, and substantial evidence, and is in accordance with law." *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993), citing R.C. 119.12.

{¶ 70} The exhibit referenced by the Wolfs during Dr. Hambly's deposition (Plaintiffs' Ex. 58) was not admitted at trial, and no proffer was made, at least in the record we have before us. Therefore, there is no record regarding the State Medical Board complaints. Both sides did reference these materials when discussing the motions in limine prior to trial. Resort to those materials, however, indicates that Dr. Rothstein was charged with certain offenses in 2012, but voluntarily surrendered his medical license in April 2013. See documents attached to Doc. #163, Memorandum in Response to *Daubert* Challenges and Motions in Limine Filed by Defendants RHI and NALSI. There was, thus, no finding by the Ohio State Medical Board, only allegations that would be of no probative value.

{¶ 71} Additionally, we rejected the testimony in *Lumpkin* because it was unfairly prejudicial. *Lumpkin*, 2d Dist. Darke No. 1615, 2004-Ohio-264, at ¶ 16, citing *McGarry v. Horlacher*, 149 Ohio App.3d 33, 2002-Ohio-3161, 775 N.E.2d 865 (2d Dist.), and Evid.R. 403(A), which excludes relevant evidence if undue prejudice outweighs its probative value. We stressed that "[t]he circumstances of the case before us are even stronger than those in *McGarry, supra*, because there was, at the time of trial, no finding of prior medical malpractice." *Id.* at ¶ 23.

{¶ 72} Although a jury had apparently found Dr. Rothstein guilty of medical

malpractice in one of the prior filed cases, there appears to be no similarity at all between that case and the present – at least, based on the statements in Riverview's memorandum, which the Wolfs did not challenge in the trial court. The intent of admitting evidence as to any of these prior medical cases would have been to influence the jury to conclude that since Dr. Rothstein had been previously sued, he, therefore, committed malpractice in the case at hand. Clearly, this would have been prejudicial.

{¶ 73} In *Lumpkin*, we also noted that "[a] fair inference of medical malpractice from prior, similar bad outcomes in similar medical procedures would seem to require, at a minimum, some expert testimony that the frequency of bad outcomes exceeds the statistical norm that would be expected in the absence of malpractice. Evidence of this kind, while not necessarily sufficient, by itself, to prove malpractice, would appear to support a fair, reasonable inference of malpractice that would make it probative and admissible." *Lumpkin v. Wayne Hosp.*, 2d Dist. Darke No. 1615, 2004-Ohio-264, at ¶ 59. Again, this type of evidence was neither submitted nor proffered. Instead, the Wolfs, at most, offered evidence that five to 10 percent of procedures fail. No evidence was presented or proffered to indicate that Dr. Rothstein's percentage of failures exceeded this amount.

{¶ 74} In view of the preceding discussion, the evidence in question was not properly proffered, was not relevant, and in any event, would have been unduly prejudicial.

{¶ 75} Finally, concerning the fraud allegations, a claim for fraud contains the following requirements: "(1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with

knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance." *Volbers–Klarich v. Middletown Mgt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, 929 N.E.2d 434, ¶ 27, citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101 (1986).

**{¶ 76}** The record before us contains only the testimony of the Riverview C.E.O., Ethan Fallang, who was not questioned about any knowledge of malpractice or incompetence of Dr. Rothstein. Moreover, as was noted, the record lacks any proffer in connection with Fallang's testimony.

**{¶ 77}** Accordingly, the Third Assignment of Error is without merit and is overruled.

### V. Misconduct in Displaying Jury Instructions to the Jury

**{¶ 78}** The Wolfs' Fourth Assignment of Error states that:

Error Occurred, Tainting the Verdict, When Counsel for Defendant NALSI Engaged in Misconduct, When on Three Occasions, Jury Instructions/Interrogatories that Had Not Been Approved by the Court Were Displayed to the Jury.

**{¶ 79}** Under this assignment of error, the Wolfs contend that counsel for NALSI committed misconduct during closing argument by displaying jury interrogatories that had not yet been approved by the court, and then compounded the misconduct by again displaying another interrogatory after being instructed by the court not to do so.

**{¶ 80}** As was previously noted, trial counsel are given great latitude in presenting

closing argument to the jury. *Pang*, 53 Ohio St.3d 186, 559 N.E.2d 1313, at paragraph two of the syllabus. Trial courts also have discretion in deciding if counsel have exceeded the bounds of permissible argument, and the court's decision will not be reversed "absent an abuse of discretion." *Id.* at paragraph three of the syllabus.

{¶ 81} We have reviewed the entirety of the closing argument, and find no misconduct in this regard. Counsel for NALSI did place a jury interrogatory in view of the jury during closing argument. Transcript of Proceedings (Closing Argument only), p. 37. After counsel objected, the court told counsel not to display the interrogatory because the interrogatories were not final. The court did indicate that counsel could talk about the interrogatory. *Id.* Consistent with the court's ruling, counsel discussed the interrogatory. Subsequently, counsel for NALSI again displayed an interrogatory to the jury, and the Wolfs objected. *Id.* at p. 38. The bench discussion indicates, however, that counsel for NALSI thought this was appropriate because the interrogatory was one to which there was no objection. *Id.* When the court disagreed and told counsel not to display the interrogatories, no further interrogatories were shown to the jury.

{¶ 82} We do not consider this misconduct, as there was a legitimate disagreement. Furthermore, the Wolfs fail to demonstrate prejudice. As was noted, when misconduct occurs, the issue is whether the conduct was so prejudicial as to deprive the opposing party of a fair trial. *Willard*, 144 Ohio App.3d at 776, 761 N.E.2d 688. The Wolfs fail to indicate in their brief how they were prejudiced. In addition, Defendants argue in their briefs that the interrogatories shown were the ones ultimately given to the jury, and the Wolfs do not dispute this.

{¶ 83} Based on the preceding discussion, the Fourth Assignment of Error is

overruled.

## VI.   Error in Allowing Leading Questions

{¶ 84} The Wolfs' Fifth Assignment of Error is as follows:

The Trial Court Erred, as a Matter of Law, When It Allowed Counsel for Defendants/Appellees to Repeatedly Lead Defendant-Appellees' Expert Witnesses on Direct Examination, and to Elicit Opinions Without a Proper Foundation.

{¶ 85} Under this assignment of error, the Wolfs contend that the trial court erred in allowing defense counsel to improperly lead their expert witnesses.   Evid.R. 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony."   Nonetheless, a trial court may permit this form of questioning in its sound discretion.   (Citations omitted.)   *Lambert v. Shearer*, 84 Ohio App.3d 266, 275, 616 N.E.2d 965 (10th Dist.1992).   "By the restriction on leading questions the law seeks to encourage honest, narrative answers as opposed to positions put forth by counsel."   (Citation omitted.)   *Id.* at 276.

{¶ 86} We have reviewed the entirety of the transcript, and counsel for Riverview at times did ask unnecessarily leading questions.   We cannot find that this, in and of itself, was prejudicial.   As was noted in *Lambert*, each doctor's answers "clearly communicated his own thoughts."   *Lambert* at 276.   In addition, the Wolfs made very few objections at trial.   *See* Transcript of Proceedings (Testimony of Robert Biscup, M.D., only), pp. 9, 112, and 114; Transcript of Proceedings (Testimony of Erich Richter,

M.D., only), pp. 24 and 31-32. They also fail to argue on appeal how this was prejudicial.

**{¶ 87}** Accordingly, the Fifth Assignment of Error is overruled.

VII. Error in Refusing Cross-Examination

**{¶ 88}** The Wolfs' Sixth Assignment of Error states that:

The Trial Court Erred, as a Matter of Law, When It Pre-empted Cross Examination of the Representative of Riverview Health Institute Concerning the Relationship Between and Among the Surgeon Lawrence Rothstein, Defendant/Appellee Riverview Health Institute, and Defendant/Appellee North American Laserscopic Spine Institute.

**{¶ 89}** Under this assignment of error, the Wolfs argue that the trial court erred when it failed to allow testimony about whether Dr. Rothstein had been an employee of Riverview prior to 2009, and refused to allow them to explore the fact that all three defendants used the same attorney in a prior case and that the lawyer made admissions about the status of the parties' relationship. Again, the trial court has discretion in admitting evidence, and we review the court's decision for abuse of discretion, with a focus on whether the proponent of the evidence was materially prejudiced. *Lumpkin*, 2d Dist. Darke No. 1615, 2004-Ohio-264, at ¶ 12.

**{¶ 90}** After reviewing the record, we cannot find that the trial court acted unreasonably in failing to allow this testimony. The court did allow the Wolfs to elicit testimony indicating that Riverview held Dr. Rothstein out on its website as a member of Riverside's "team." The testimony of Ethan Fallang also raises inferences that Riverview promoted Dr. Rothstein's surgery. However, whether Dr. Rothstein was an employee

prior to 2009 is irrelevant to surgery that took place in 2009.

{¶ 91} The court also allowed testimony indicating that Judah wrote a check to Riverview for his surgery, and that Riverview paid NALSI for Dr. Rothstein's services. The evidence could have been sufficient to establish agency by estoppel, which is based upon the same elements as apparent authority. *Whitlow v. Good Samaritan Hosp.*, 42 Ohio App.3d 74, 76, 536 N.E.2d 659 (2d Dist.1987) (noting that the negligence of a doctor who is not an employee of a hospital may be imputed to the hospital under a theory of apparent agency).

{¶ 92} The jury apparently chose to conclude that the hospital did not hold itself out as a provider of Dr. Rothstein's services. In view of the limited record before us, we cannot say this is due to the failure to admit evidence. More importantly, however, even if the trial court erred in failing to admit the evidence, any error would have been harmless, because the jury found that Dr. Rothstein was not negligent. Any liability of Riverview would have been dependent on that initial finding.

{¶ 93} Based on the preceding discussion, the Sixth Assignment of Error is overruled.


VIII. Cumulative Error

{¶ 94} The Wolfs' Seventh Assignment of Error states that:

> For All of the Reasons Stated Herein, the Trial Court Erred When It Did Not Grant Relief Pursuant to Civil Rule 59 and/or Civil Rule 60 Post Trial.

{¶ 95} Under this assignment of error, the Wolfs present what appears to be a

cumulative error argument, contending that all the arguments in the preceding assignments of error demonstrate that the trial court should have granted their motion for new trial or motion for relief from judgment.

**{¶ 96}** We have observed that "[t]he cumulative-error doctrine traditionally has not been applied in the civil context." *Cummins v. Kettering Med. Ctr.*, 2d Dist. Montgomery No. 22170, 2008-Ohio-2591, ¶ 62, citing *Frost v. Snitzer*, 11th Dist. Trumbull No. 2005-T-0090, 2006-Ohio-3882, ¶ 107 and *Brewer v. Sky Climber, Inc.*, 2d Dist. Montgomery No. 8071, 1984 WL 5329 (June 14, 1984). We also noted that "the doctrine requires the presence of individually harmless errors that, when viewed together, violate a person's right to a fair trial." *Id.*, citing *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000).

**{¶ 97}** In the case before us, we have found only one assignment of error that even potentially involves harmless error, and have found no error in the rest of the trial. Accordingly, there would be no basis for applying the cumulative error doctrine, even if it applied to civil trials. *See, e.g., Mancz v. McHenry*, 2012-Ohio-3285, 974 N.E.2d 784, ¶ 76 (2d Dist.) (refusing to find cumulative error where the court did not find merit in the other assignments of error).

**{¶ 98}** Based on the preceding discussion, the Seventh Assignment of Error is overruled.


IX.  Conclusion

**{¶ 99}** All of the Wolfs' assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Gary J. Leppla
Philip J. Leppla
David Lockemeyer
Joshua DeBra
Robert Snyder
Susan Blasik-Miller
Steven Rothstein
Hon. James A. Brogan (sitting by assignment)